Joseph H. Lemkin (JL-2490)
**DUANE MORRIS LLP**
**A Delaware Limited Liability Partnership**
744 Broad Street
Suite 1200
Newark, New Jersey 07102
(973) 424-2000
Facsimile (973) 424-2001

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BANC OF AMERICA PRACTICE SOLUTIONS, INC., as servicer for BANK OF AMERICA, successor by merger and acquisition to MBNA AMERICA (DELAWARE), N.A., assignee of Sky Bank, and as agent for U.S. Bank Trust National Association,<br><br>              Plaintiff,<br><br>       v.<br><br>WEST 86TH STREET DENTISTRY, PC AND NKEMJIKA S. OBIECHINA, DMD,<br><br>              Defendants. | Civil Action No.<br><br><br><br>**AFFIDAVIT OF**<br>**JOSEPH L. HEETER, ESQ.**<br>**IN SUPPORT OF ORDER TO SHOW**<br>**CAUSE FOR AN ORDER OF**<br>**SEIZURE PURSUANT TO CPLR 7102,**<br>**MADE APPLICABLE BY FED. R. CIV.**<br>**P. 64** |

JOSEPH L. HEETER, ESQ., being duly sworn, deposes and says:

1.      I am employed as Assistant General Counsel by Bank of America (hereinafter "BOA" or "Plaintiff") and, as such, I am fully familiar with the facts and circumstances of this action and have in my possession all the papers and documents in connection therewith. I submit this Affidavit in support of BOA's Order to Show Cause for an Order of Seizure, as provided for in CPLR 7102, made applicable by Fed. R. Civ. P. 64.

2.      Upon information and belief, defendant West 86th Street Dentistry ("Borrower") is a professional corporation, with its principal place of business at 255 Central Park West, New York, New York 10024 (the "Premises").

3.      Upon information and belief, defendant Nkemjika S. Obiechina, DMD ("Guarantor") is an individual presently residing at 170 Jane Street, Englewood, New Jersey 07631.  Guarantor is the President of West 86th Street Dentistry.

4.      Simultaneously with this seizure proceeding, Plaintiff is commencing an action in this Court against the Defendants by service of a Summons and Complaint, a copy of which is annexed hereto without exhibits as **Exhibit A**.

5.      For purposes of brevity, I will not repeat all of the facts of this matter, as they are voluminous, not all related to the instant Order to Show Cause seeking an Order of Seizure, and are more fully set forth in the Complaint filed simultaneously herewith.  The relevant facts as they relate to Plaintiff's Order to Show Cause seeking an Order of Seizure are set forth below.

6.      On or about June 16, 2003, for good and valuable consideration, Borrower entered into a Finance Agreement (the "Finance Agreement") with BOA's predecessor, Sky Bank, whereby Sky Bank loaned $250,000.00 to the Borrower in order to provide initial financing for the Borrower's dental practice in New York, New York.  A true and correct copy of the Finance Agreement is annexed hereto as **Exhibit B.**

7.      In addition to the loan memorialized in the Finance Agreement, Borrower also obtained a Second loan from Sky Bank in the original principal amount of $26,900.00 (the "Second Finance Agreement").  A true copy of the Second Finance Agreement is annexed hereto as **Exhibit C**.

2

8.    Pursuant to the terms of the Finance Agreement and the Second Finance Agreement (collectively, the "Loan Documents"), Borrower agreed to make certain monthly payments to BOA as more particularly described therein.

9.    Guarantor solely and unconditionally guaranteed all of the indebtedness arising directly or contingently from the Loan Documents.  Borrower also executed a personal guarantee of all indebtedness arising directly or contingently from the Loan Documents.  The guarantees of Borrower and Guarantor are contained in the Finance Agreement and Second Finance Agreement annexed as **Exhibit B & C**.

10.    Borrower has defaulted under the terms of the Loan Documents by, *inter alia*, failing to make payments due to BOA on account of the Finance Agreement since April 3, 2007, which payment was applied to Borrowers' February, 2007 obligation to BOA.  Presently, borrower is past due for the March, April and May, 2007 payments due under the Finance Agreement along with accrued late fees, interest and other charges due, which now totals approximately $16,146.50.

11.    Despite the demand letters and several prior attempts by BOA to have Defendants cure the arrears under the Finance Agreement, the Defendants have refused and continue to refuse to pay for the arrearages noted above in violation of the Finance Agreement and all accompanying documents.

12.    As of May 17, 2007, there is due and owing by the Borrower to BOA the default balance (which includes, *inter alia*, late charges and past due amounts) of $288,000.16, plus attorneys' fees, costs and any other charges under the Finance Agreement, all of which continue to accrue.  The balance on the Second Finance Agreement is $20,098.42.

3

13.    In order to secure payment of Borrower's obligations under the Loan Documents, BOA obtained a first priority lien and security interest, which encumbers all of the assets of the dental practice operated by the Borrower including, but not limited to, assets, equipment, inventory, accounts, general intangibles, chattel paper, machinery and fixtures, and the proceeds of all of the foregoing (the "Collateral"). BOA's predecessors perfected their security interest in the collateral by filing a UCC-1 Financing Statement with the New York Secretary of State. A copy of the UCC-1 Financing Statement that refers to the Collateral is annexed hereto as **Exhibit D**.

14.    The Collateral is now being intentionally and wrongfully converted and detained by Borrower and is situated at the premises located at 255 Central Park West, New York, New York.

15.    The fair market value of the Collateral is approximately $ 195,000.00.[1]

16.    Pursuant to the Loan Documents, upon default by the Borrower, BOA is entitled to immediate possession of the Collateral.

17.    In addition to the Defendants substantial delinquency with BOA, Defendants appear to be on the brink of eviction from the Premises. We have recently learned that the Landlord of the premises commenced an eviction action one year ago - in May 2006. See attached affirmation of Matthew L. Gordon, Esq., annexed hereto as **Exhibit E**. As set forth in Mr. Gordon's certification Borrower has a tortured history with the Landlord.

18.    Mr. Gordon's certification reveals that on September 18, 2006, Defendant entered into a Stipulation of Settlement with the Landlord in order to cure the rental arrears due to the

---

[1] This value is based upon a complete recovery of the dental practice in place, including good will. The actual liquidation value of the Collateral would be substantially lower than this amount. In addition, this value is based upon financial information from the year 2005 and may change based upon the practice's 2006 financial figures.

4

Landlord. Apparently, however, Borrower immediately breached the stipulation by failing to make the required payments during the first month of the agreement. Borrower seems to have been afforded numerous extensions but never completely cured her default with the Landlord. Based upon Defendants' substantial delinquency with BOA and tortured history with the Landlord, it does not appear possible the Defendant can remain current with both BOA and the Landlord. Given the uncertain relationship with the Landlord with an eviction looming as well as the continued delinquency under the Finance Agreement, BOA is extremely concerned with the security of its collateral and in accordance with the Loan Documents is entitled to the immediate recover of its collateral.

19.      BOA is not aware of any defense to its claims.

20.      No prior application for this or any other provisional remedy has been requested.

WHEREFORE, the deponent respectfully requests that this Court issue an Order directing the U.S. Marshal for this District, or other law enforcement officer to seize the subject Collateral described herein, and for that purpose, if the subject Collateral is not delivered to him, to break open, enter and search for the subject Collateral in the place where the Collateral may be and hold same for Plaintiff.

JOSEPH L. HEETER, ESQ.

Sworn to and Subscribed before me
this 25th day of _May_____, 2007

Notary Public

NOTARIAL SEAL
STATE OF OHIO

MICHAEL W. BODAK
Notary Public
In and for
the State of Ohio
My Commission Expires
August 6, 2011

5

# EXHIBIT A

Joseph H. Lemkin (JL-2490)
**DUANE MORRIS LLP**
A Delaware Limited Liability Partnership
744 Broad Street, Suite 1200
Newark, New Jersey 07102
(973) 424-2000
Facsimile (973) 424-2001

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BANC OF AMERICA PRACTICE SOLUTIONS, INC., as servicer for BANK OF AMERICA, successor by merger and acquisition to MBNA AMERICA (DELAWARE), N.A., assignee of Sky Bank, and as agent for U.S. Bank Trust National Association,<br><br>                    Plaintiff,<br><br>          v.<br><br>WEST 86TH STREET DENTISTRY, PC AND NKEMJIKA S. OBIECHINA, DMD,<br><br>                    Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No.<br><br><br><br><br><br>**COMPLAINT** |

Plaintiff, Banc of America Practice Solutions, Inc (f/k/a MBNA Practice Solutions, Inc., f/k/a Sky Financial Solutions, Inc.) as servicer for Bank of America, N.A., successor by merger and acquisition to MBNA America (Delaware N.A.) assignee of Sky Bank and as agent for U.S. Bank Trust National Association ("BOA"), as and for its complaint against defendants West 86th Street Dentistry, PC and Nkemjika S. Obiechina (collectively, "Defendants"), alleges as follows:

    1.    BOA is a corporation organized and existing under the laws of the State of Ohio, having an office for the transaction of business at 2740 Airport Drive, Suite 300, Columbus, Ohio 43219. BOA is authorized to conduct business in the State of New York.

2.      Upon information and belief, defendant West 86th Street Dentistry ("Borrower") is a professional corporation, with its principal place of business at 255 Central Park West, New York, New York 10024.

3.      Upon information and belief, defendant Nkemjika S. Obiechina, DMD ("Guarantor") is an individual presently residing at 170 Jane Street, Englewood, New Jersey 07631. Guarantor is the President of West 86th Street Dentistry.

### JURISDICTION

4.      The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

### VENUE

5.      Venue is appropriate in this Court pursuant to 28 U.S.C. §1391 (c).

### FIRST CAUSE OF ACTION
**(Breach of Contract)**

6.      Plaintiff repeats, realleges and reiterates each of the foregoing paragraphs as though fully set forth herein.

7.      On or about June 16, 2003, for good and valuable consideration, Borrower entered into a Finance Agreement (the "Finance Agreement") with BOA's predecessor Sky Bank, whereby Sky Bank provided a loan (loan # 1827260-9001) in the original principal amount of $250,000 to the Borrower in order to provide initial financing for the Borrower's dental practice located at 255 Central Park West, New York, New York 10024. A true and correct copy of the Finance Agreement is annexed hereto as **Exhibit A**.

8.      Pursuant to the terms of the Finance Agreement, Borrower agreed to make certain monthly payments to BOA as more particularly described therein.

2

9.    Borrower has defaulted under the terms of the Finance Agreement by, *inter alia*, failing to make payments due to BOA since April, 2007, as well as late fees and other charges due under the Finance Agreement.  Said payment was on account of and applied to Borrowers February, 2007 obligation under the Finance Agreement.

10.    On or about February 15, 2007, BOA sent demand letters to the Defendants for payment of all arrears under the obligations due and owing to BOA.  Copies of the written notices of default sent to the Defendants are annexed hereto collectively as **Exhibit B**.

11.    Despite the demand letters and several prior attempts by BOA to have Defendants cure all arrears under the Finance Agreement, the Defendants have refused and continue to refuse to pay for the arrearages noted above in violation of the Finance Agreement and all accompanying documents.

12.    As of May 24, 2007, there is due and owing by the Borrower to BOA the default balance (which includes, *inter alia*, late charges and past due amounts) of $288,000.16, plus attorneys' fees, costs and any other charges under the Finance Agreement, all of which continue to accrue.

13.    BOA has and hereby declares all sums due and to become due for the full term of the Finance Agreement immediately due and payable.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

14.    Plaintiff repeats, realleges and reiterates each of the foregoing paragraphs as though fully set forth herein.

15.    In addition to the loan memorialized in the Finance Agreement, on or about August 4, 2003, Borrower entered into a second Finance Agreement (the "Second Finance Agreement") with BOA's predecessor Sky Bank, whereby Sky Bank provided a loan (loan #

3

1827260-9002) in the original principal amount of $26,900.00 to the Borrower. A true and correct copy of the Second Finance Agreement is annexed hereto as **Exhibit C**.

16.    Pursuant to the Second Finance Agreement, events of default include: (a) failure "to make any payment of the Indebtedness[1] within 10 days after it first becomes due," and (b) where "Borrower or any Guarantor defaults in the performance of any of their obligations or breaches any representation, covenant, or warranty under this Agreement **or any other agreement** with Lender or any affiliate of Lender..." See Exhibit D, p. 4.

17.    Borrower's failure to make payment and associated defaults in accordance with the Finance Agreement, as discussed above, constitute an "Event of Default" under the terms of the Second Finance Agreement. Accordingly, in accordance with the terms of the Second Finance Agreement, BOA may exercise its right to declare the full amount of Borrower's indebtedness due and owing. See Second Finance Agreement, Exhibit D, p. 5.

18.    On or about March 13, 2007, BOA sent demand letters to the Defendants for payment of all arrears under the obligations due and owing to BOA pursuant to the Second Finance Agreement. Copies of the written notices of default sent to the Defendants are annexed hereto collectively as **Exhibit B**.

19.    Despite the demand letters and several prior attempts by BOA to have Defendants cure all arrears with respect to the Finance Agreement, the Defendants have refused and continue to refuse to pay for the arrearages noted above in violation of the Second Finance Agreement.

---

[1] "Indebtedness" is defined in the Second Finance Agreement as "the Principal Amount plus all interest, fees and expenses due or to become due Lender pursuant to the terms hereof and also any and all other liabilities of Borrower to Lender or any affiliate of Lender, whether now existing or hereafter arising, absolute or contingent, due or to become due, including all interest, fees and expenses incurred in connection therewith..." See Second Finance Agreement, Exhibit D, p. 2.

20.    As of May 24, 2007, there was due and owing by the Borrower and Guarantors to BOA the default balance (which includes, *inter alia*, late charges and past due amounts) of $20,098.42, plus attorneys' fees, and costs, and any other charges under the Second Finance Agreement, all of which continue to accrue.

21.    BOA has and hereby declares all sums due and to become due under the Second Finance Agreement immediately due and payable.

### THIRD CAUSE OF ACTION
### (Replevin)

22.    BOA repeats, realleges and reiterates each of the foregoing paragraphs as though fully set forth herein.

23.    In order to secure payment of Borrower's and Guarantor's obligations under the various loan documents described in paragraphs 7 through 22 above (collectively, the "Loan Documents"), BOA obtained a first priority lien and security interest, which encumbers all of the assets of the dental practice operated by the Borrower, including but not limited to assets, equipment, inventory, accounts, general intangibles, chattel paper, machinery and fixtures and the proceeds of all of the foregoing (the "Collateral"). BOA's predecessor perfected its security interest in the collateral by filing a UCC-1 Financing Statement with the New York Secretary of State. A copy of the UCC-1 Financing Statement that refers to the Collateral is annexed hereto as **Exhibit D**.

24.    Pursuant to the Loan Documents, upon default by the Borrower or Guarantor, BOA is entitled to immediate possession of the Collateral.

25.    As set forth above, Borrower and Guarantor have defaulted under the Loan Documents by failing to make payment to BOA when due.

5

26.    The Collateral has been intentionally and wrongfully converted and detained by Borrower and Guarantor and is situated at the premises located at 255 Central Park West, New York, New York 10024.

27.    The fair market value of the Collateral is approximately $195,000.[2]

28.    Accordingly, BOA is now entitled to immediate possession of the Collateral.

29.    Upon information and belief, the Collateral has not been taken for a tax, assessment, or fine pursuant to law, nor has it been taken under an execution or attachment against the property of the Plaintiff.

30.    Plaintiff hereby demands turnover of the Collateral.

## FOURTH CAUSE OF ACTION
### (Breach of Guarantees)

31.    BOA repeats, realleges and reiterates each of the foregoing paragraphs as though fully set forth herein.

32.    Guarantor personally, solely and unconditionally guaranteed all of the indebtedness arising directly or contingently from the Loan Documents, including all indebtedness of Borrower. Guarantor's guarantees are contained on **Exhibit A and C**.

33.    As of February 15, 2007, there was due and owing and payable by Guarantor, individually to BOA, as a guarantor pursuant to the Loan Documents, the total sum of $308,098.58.

---

[2]    This value is based upon a complete recovery of the dental practice in place, including good will. The actual liquidation value of the Collateral would be substantially lower than this amount. In addition, this value is based upon financial information from the year 2005 and may change based upon the practice's 2006 financial figures.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

34.    Plaintiff repeats, reiterates and realleges each of the forgoing paragraphs as though fully set forth herein.

35.    The Borrower received the above described loan proceeds and other valuable consideration as set forth in the Loan Documents and have full use of the proceeds of the loans without making payment therefore as required under the Loan Documents.

36.    Borrower has been unjustly enriched in an amount equal to $308,098.5, the total outstanding payments due and owing to BOA.

37.    Accordingly, Borrower is liable to BOA in the amount of $308,098.58, due to such unjust enrichment.

## SIXTH CAUSE OF ACTION
### (Attorneys' Fees and Costs as against Borrower and Guarantor)

38.    Plaintiff repeats, reiterates and realleges each of the forgoing paragraphs as though fully set forth herein.

39.    The Loan Documents provide that Borrower and Guarantor are liable for all legal fees and costs incurred by BOA as a result of Borrower's and Guarantor's default.

40.    By reason of Borrower's and Guarantor's defaults under the Loan Documents and their failure to cure the same, BOA retained attorneys to pursue collection of this matter.

41.    Accordingly, BOA is entitled to an award of its attorneys' fees and costs incurred and to be incurred in the prosecution of this action.

**WHEREFORE,** BOA hereby demands judgment as follows:

A.    On the First Cause of Action:

1.    Awarding a money judgment against West 86th Street Dentistry, PC, in the amount of $288,000.16, with interest thereon from May 24,

7

2007, until the date of which all amounts due thereunder have been paid, plus late charges and attorneys fees.

B.    On the Second Cause of Action:

    1.    Awarding a money judgment against West 86th Street Dentistry, PC, in the amount of $20,098.42, with interest thereon from May 24, 2007, until the date of which all amounts due thereunder have been paid, plus late charges and attorneys fees.

C.    On the Third Cause of Action:

    1.    For an Order giving BOA possession of the Collateral, plus damages for its wrongful detention; and in the event the Collateral cannot be delivered to BOA, that BOA have judgment against Defendants for the value thereof, plus damages for its wrongful detention.

D.    On the Fourth Cause of Action:

    1.    Awarding a money judgment against West 86th Street Dentistry, PC, and Njemjika S. Obiechina, in the amount of $308,098.58, with interest thereon from May 24, 2007, until the date of which all amounts due thereunder have been paid, plus late charges and attorneys fees.

E.    On the Fifth Cause of Action:

    1.    Awarding a money judgment against West 86th Street Dentistry in the amount of $308,098.58, with interest thereon from May 24, 2007, until the date of which all amounts due thereunder have been paid, plus late charges and attorneys fees.

F.    On the Sixth Cause of Action:

    1.    Awarding a money judgment against West 86th Street Dentistry and Nkemjika S. Obiechina, each in an amount to be determined, for BOA's fees and costs incurred in the prosecution of this action.

8

G.     Any additional and further relief as may be deemed just and appropriate.

Respectfully submitted,

DUANE MORRIS LLP

By: _____

Joseph H. Lemkin (JL-2490)
744 Broad Street
Newark, N.J. 07102
Telephone (973) 424-2000
Facsimile (973) 424-2001

Attorneys for Banc of America Practice
Solutions, Inc.

Dated:  May 24, 2007

9

# EXHIBIT B

JUN. 3.2003  5:15PM  SKY FINANCIAL                              NO.201   P.3/9



# Finance Agreement

**Box 1**

BORROWER: (Legal Name): West 86th Street Dentistry, P.C.

**Box 2**

ADDRESS: 2 West 86th St.                         BUSINESS PHONE:

ADDRESS:                                          HOME PHONE: (201) 413-5309

CITY: New York          ST: NY      ZIP: 10024    COUNTY:

| Box 3 | Box 3 (con't) |
|---|---|
| TYPE OF ORGANIZATION: Professional Corporation | STATE OF ORGANIZATION: NJ |

| Box 4 PRINCIPAL AMOUNT | Box 5 TERM | Box 6 MONTHLY PAYMENT | Box 7 ADVANCE PAYMENT |
|---|---|---|---|
| $250,000.00 | 120 (Months) | 4 payments @ $0.00<br>4 payments @ $500.00<br>4 payments @ $1,000.00<br>12 payments @ $1,172.00<br>12 payments @ $2,345.00<br>12 payments @ $3,517.00<br>72 payments @ $4,689.00 | $0.00 |

ADDITIONAL PROVISIONS:
A balloon payment equal to 10% of the Principal Amount is due and payable on the same date as the final payment under this Agreement.

DESCRIPTION OF ASSET (S)  All assets now owned or hereafter acquired, including but not limited to, the dental practice located at 2 West 86th St. New York, NY  10024

Please initial   N.O

DISCLAIMER: No supplier, broker or salesperson is an agent of Lender or its assignee with respect to the Indebtedness, as defined herein, nor are they authorized to waive or alter the terms of this Agreement.  Their representatives shall in no way affect Borrower's or Lender's rights and obligations as herein set forth.  Borrower acknowledges that Borrower independently selected and determined the suitability of the Indebtedness for Borrower's intended use, without being advised by Lender.

This Finance Agreement (this "Agreement") is the promissory note, security agreement and personal guaranty, all of which are to be construed together and are binding upon the parties hereto. This Agreement is prepayable after year 3 of its Term, subject to the terms and conditions herein contained. Borrower and any Guarantor have read and accepted all terms of this Agreement prior to signing it.  This Agreement is being executed for business purposes and not for personal

Option 1 – Revised 04/02                 Page 1 of 7              Please initial     N.O 



family, household or agricultural purposes. Time is of the essence in Borrower's and Guarantor's performance of their obligations hereunder and under all related instruments and documents executed and/or delivered pursuant hereto and any renewals or extensions thereof.

**DEFINITIONS:** As used in this Agreement, the capitalized terms set forth below shall have the following meanings: (a) *"Acceptance Date"* means the date set forth in box 9; (b) *"Borrower"* means the individual or entity whose name appears in box 1, and its successors and assigns; (c) *"Collateral"* means all personal property of Borrower wherever located, and whether now owned or hereafter acquired, including without limitation: (i) Accounts, including health-care insurance receivables; (ii) Chattel Paper; (iii) Inventory; (iv) Equipment; (v) Instruments; (vi) Investment Property; (vii) Documents, including patient lists, records and files; (viii) Deposit Accounts; (ix) General Intangibles, including patient lists, records and files; (x) Supporting Obligations; (xi) the assets described in the Description of Asset(s) text box above; and (xii) to the extent not listed above as original Collateral, proceeds and products of the foregoing, including but not limited to, payments from insurance claims for the loss, damage or destruction of any of the Collateral. Any term used in the UCC and not defined in this Agreement has the meaning given to the term in the UCC, as the same may be amended from time to time; (d) *"Contract Balance"* means the sum total of all Monthly Payments of principal and interest due over the Term; (e) *"Default Rate"* means the lesser of (i) 5 percentage points above the Effective Rate; or (ii) the maximum rate of interest permitted by applicable state law; (f)    *"Effective Rate"* means the fixed rate of interest that is sufficient to fully amortize the Principal Amount less the balloon payment set forth in the Additional Provisions text box above, if any, borrowed over the Term at the Monthly Payment; (g) *"Guarantor"* means, collectively, jointly and severally, the individual or individuals whose names appear in box 8, or on any other guaranty agreement related to this Agreement; (h) *"Indebtedness"* means the Principal Amount plus all interest, fees and expenses due or to become due Lender pursuant to the terms hereof and also any and all other liabilities of Borrower to Lender or any affiliate of Lender, whether now existing or hereafter arising, absolute or contingent, due or to become due, including all interest, fees and expenses incurred in connection therewith; (i) *"Lender"* means Sky Bank, an Ohio banking corporation, and its successors and assigns; (j) *"Maturity Date"* means the final day of the Term; (k) *"Monthly Payment"* means the amount set forth in box 6 above; (l) *"Payment Date"* means the day of the month scheduled by Lender for the Monthly Payment; (m) *"Principal Amount"* means the amount set forth in box 4 above; (n) *"Security"* means all guaranties of any Indebtedness, all interests of Lender in the Collateral and all other agreements, rights, or interests insuring or guaranteeing payment of any Indebtedness or giving the Indebtedness priority over the repayment or performance of other obligations of Borrower; (o) *"Term"* means the period from the Acceptance Date until the Maturity Date; and (p) *"UCC"* means the Uniform Commercial Code, as the same may be amended from time to time.

**PROMISSORY NOTE:** 1. Loan. Subject to the terms and conditions set forth herein, Lender shall loan to Borrower the Contract Balance. Borrower, for value received, promises to pay the Indebtedness to the order of Lender in accordance with the terms of this Agreement.

2.  Conditions Precedent to Loan. The obligation of Lender to advance the Principal Amount is subject to all of the conditions and requirements of this Agreement and delivery of the following required documents or other action, all of which are conditions precedent: (a) upon the request of Lender, if Borrower is a corporation, a certified resolution of Borrower's Board of Directors duly authorizing the execution, delivery and performance of all of the documents required hereunder, or, if Borrower is a partnership or a limited liability company, resolutions of Borrower's partners or members, as applicable, duly authorizing the execution, delivery and performance of all of the documents required hereunder, (b) UCC financing statements duly executed on Borrower's behalf, if required, (c) upon Lender's request, the execution and delivery of such other instruments, documents, agreements or guaranties as Lender may deem necessary or appropriate to consummate or implement the transactions contemplated hereby; (d) completion or fulfillment of any conditions listed in the Additional Provisions text box above; (e) Borrower shall have taken such other action as Lender may reasonably require to perfect its security interest in the Collateral and shall have paid all costs incident thereto; and (f) completion and fulfillment by Borrower of all terms, provisions, and conditions of the Credit Conditions and Funding Requirements issued by Lender to Borrower.

3.  Interest. Interest will be charged at the Effective Rate on all unpaid Indebtedness, except that Borrower shall pay interest at a rate equal to the Default Rate on any Indebtedness not paid when due and on any judgment obtained by Lender against Borrower or Guarantor pursuant to this Agreement. The amount of interest to be paid by the Borrower is equal to the difference between the sum of all Monthly Payments and the Principal Amount. Borrower agrees to pay Lender interest at the Effective Rate on the Principal Amount from the Acceptance Date to the first Payment Date.

4.  Scheduled Payments. The Contract Balance, plus all unpaid accrued interest, fees and other charges permitted in this Agreement, shall be due and payable in full on the Maturity Date. Until the Maturity Date, Borrower shall make Monthly Payments to Lender on or before each Payment Date during the Term. All such sums due and payable by Borrower to Lender shall be applied first to reduce the then outstanding Contract Balance, and second, to any outstanding fees, charges, and expenses permitted under this Agreement. Any payment received in advance of the Acceptance Date will be applied to the last payment due under this Agreement. Borrower shall make all scheduled payments to Lender at such address as Lender may designate in writing from time to time.

Lender can accept late or partial payments, as well as payments marked "paid in full" or with other restrictive endorsements, without losing any of its rights under this Agreement. Any payment of a smaller sum than due, and/or any partial payment intended as a payment in full of a disputed amount under the Indebtedness, regardless of any endorsement restriction, will not constitute an accord and satisfaction, and must be sent to: Sky Financial Solutions, Inc., 2740 Airport Drive, Suite 300, Columbus, Ohio 43219-2286, Attention: Customer Service Manager. Any communication with Lender concerning the Borrower's dispute of any amounts due under the Indebtedness, as well as any payments of less than the full amount due and payable hereunder, must be sent to the address set forth in the preceding sentence. All other payments the Borrower makes towards the Indebtedness are to be mailed to the address the Lender sets forth on the Borrower's monthly billing statement.

Sky
Financial
Solutions

5. **Payment Adjustments.** Borrower hereby authorizes Lender to adjust the Monthly Payment proportionately upward or downward if the Principal Amount changes after the Acceptance Date. Lender shall notify Borrower in writing of any such adjustment.

6. **Waiver of Presentment, etc.** Borrower hereby waives presentment for payment, demand, notice of nonpayment, notice of dishonor, protest, notice of protest and all other notices in connection with the delivery, acceptance, performance, default or enforcement of this Agreement or any payment made pursuant to its terms.

7. **Unconditional Obligation.** Borrower agrees that its obligation to make payments to Lender hereunder is absolute and unconditional, under all circumstances whatsoever, and shall not be affected by any defect in the condition, design or operation of the Collateral, any lack of maintenance or service of any Collateral, or any setoff, counterclaim, defense or reduction which Borrower may have against Lender, or any supplier, servicer, broker, salesperson or other third party.

8. **Set-Up Fee.** Borrower agrees to pay Lender a standard set-up fee of up to 1.75% of the Principal Amount, as compensation for Lender's costs in connection with approval and documentation of the Indebtedness.

**SECURITY AGREEMENT:** 1. **Security Interest.** Borrower grants Lender a security interest in the Collateral and the proceeds of the Collateral to secure payment and performance of the Indebtedness.

2. **Representations, Warranties and Covenants.** Borrower and any Guarantor, when applicable, represent, warrant, covenant and agree that: (a) the Collateral shall be kept at the location specified in box 2 above, Borrower shall promptly notify Lender of any change in the location of the Collateral, and Borrower shall not remove the Collateral from said location without the prior written consent of Lender; except for Inventory sold in the ordinary course of business; (b) the chief executive office and state of organization of Borrower are as set forth in boxes 2 and 3 above, and Borrower shall not relocate its chief executive office or change its state of organization without providing Lender with 30 days prior written notice; (c) except for the security interest granted hereby, and except as otherwise disclosed in writing to Lender, Borrower is the owner of the Collateral, free from any prior lien, security interest or encumbrance, and Borrower will defend the Collateral against all claims and demands of any and all persons at any time claiming the Collateral or any interest therein; (d) except for sales of Inventory in the ordinary course of business, Borrower will not sell, exchange, lease or otherwise dispose of any interest in the Collateral without the prior written consent of Lender and shall not, without the consent of Lender, permit any lien, security interest or encumbrance to attach to the Collateral; (e) Borrower authorizes Lender to file a financing statement describing the Collateral and, if Lender has pre-filed a financing statement with respect thereto, Borrower hereby ratifies such filing. Borrower hereby waives any right that Borrower may have to file with the applicable filing officer any financing statement, amendment, termination or other record pertaining to the Collateral and/or Lender's interest therein. Borrower will cooperate with Lender in obtaining control of any Collateral in which a security interest may be perfected by possession or control and will, at Borrower's expense, make and do all such acts and things as Lender may from time to time request for the better evidencing, perfection, protection or validation of or realization of the benefits of, its security interest. At the request of Lender, Borrower shall join with Lender in executing one or more financing statements, or amendments thereto, for the Collateral pursuant to the requirements of the UCC, in form satisfactory to Lender. A carbon, photographic or other reproduction of this Agreement or a financing statement will be sufficient as a financing statement. Borrower hereby appoints Lender or its designee, with full power of substitution, as Borrower's attorney-in-fact to execute UCC financing statements in Borrower's name and to perform all other acts that Lender deems necessary or appropriate to perfect and protect Lender's security interest in the Collateral. Such appointment is coupled with an interest with full power of substitution, and is irrevocable.

3. **Maintenance, Insurance, and Taxes.** Borrower shall maintain the Collateral in good condition and repair. Borrower shall, at Borrower's expense, maintain insurance on the Collateral against fire, theft, and such other hazards and in such form and amount as Lender may require. The amount of such insurance shall be not less than the greater of (a) the fair market value of the Collateral, or (b) the aggregate amount of outstanding Indebtedness. Lender shall be named as an additional insured and/or as loss payee on all policies of insurance required hereunder. The proceeds of such insurance shall be applied, at Lender's sole election, toward the replacement or repair of the Collateral or to reduce Borrower's then outstanding Indebtedness. Borrower hereby appoints Lender as Borrower's attorney-in-fact to make any claim for, receive payment of, or execute or endorse all documents, checks or drafts for loss or damage or return of premium under such insurance. Each insurance policy shall provide that the insurance policy cannot be cancelled without 30 days' prior written notice to Lender. Borrower agrees to furnish to Lender proof of each insurance policy insuring the Collateral by providing to Lender a copy of the certificate of insurance or the policy itself within 10 days following the date hereof. Lender shall have the right, but not the obligation, to purchase insurance on the Collateral in such amounts, from such insurers and for such premiums, as Lender may deem appropriate. Borrower agrees to promptly reimburse Lender for all costs incurred in connection with obtaining such insurance plus an administrative fee of $25.00 each month until Borrower provides evidence of such insurance. Payment of such fee does not relieve Borrower from its obligation to obtain insurance. Borrower shall pay and discharge when due all taxes imposed on the Collateral. Further, Lender may discharge taxes, liens or other encumbrances at any time levied or placed on the Collateral and pay for the maintenance and preservation of the Collateral should Borrower fail to do so. Borrower agrees to promptly reimburse Lender on demand for any payment so made, and until such reimbursement, the amount so paid by Lender shall be added to the Principal Amount of the Indebtedness.

**UNCONDITIONAL GUARANTY:** 1. **Guaranty.** Each Guarantor absolutely, unconditionally, jointly and severally guarantees the prompt payment when due of all Indebtedness. If Borrower fails to pay all or any part of any Indebtedness when due, Guarantor shall immediately pay to Lender the outstanding balance of all Indebtedness, regardless of whether or not Lender first pursues Borrower or exhausts any of its rights or remedies against Borrower or other Security. If Guarantor consists of more than one individual or entity, each Guarantor shall be jointly and severally liable to Lender with respect to all guaranteed obligations, including, without limitation, the Indebtedness.



2.  **Inducement to Lender.** Each Guarantor (a) acknowledges that Lender would not have extended any credit, including credit evidenced by the Indebtedness, to Borrower but for the guaranty; (b) represents and warrants that Guarantor has given it's guaranty to induce Lender to extend and to continue to extend credit to Borrower hereunder; (c) agrees that Lender may rely on the guaranty in extending future credit to Borrower; and (d) represents and warrants that each Guarantor has received good and valuable consideration for the guaranty; (e) waives acceptance of the guaranty; (f) represents and warrants that Guarantor has not given the guaranty in reliance upon the existence of any Security; (g) acknowledges receipt of notice of all Indebtedness existing before this date; (h) waives notice of any increases in the Indebtedness incurred after this date; and (i) waives protest and all other notices of failure to pay the Indebtedness or to perform any agreement relating to any Indebtedness or the Security.

3.  **No Reliance.** Each Guarantor (a) warrants that he/she/it has not relied on any information about Borrower, the Security, or any other guarantor of the Indebtedness in providing its guaranty of the Indebtedness; (b) warrants that Guarantor has had ample opportunity to investigate Borrower, Borrower's affairs, the Security, and the effect that the Indebtedness will have on Borrower; and (c) agrees that Lender has no obligation to provide Guarantor any information about Borrower or the Security.

4.  **Lender's Actions.** Without notice to or the consent of any Guarantor, Lender may do or refrain from doing anything affecting any Indebtedness or any Security, including, without limitation, the following: (a) granting or not granting any indulgences to anyone liable for payment of any Indebtedness or any Security; (b) failing to obtain or to perfect any Security; (c) failing to obtain an enforceable agreement to repay any Indebtedness; (d) releasing any Security or anyone or any property from liability for payment of any Indebtedness; (e) changing any agreement relating to any Indebtedness or any Security; (f) extending the time for payment of any Indebtedness; and (g) delaying in enforcing or failing to enforce any rights to payment of any Indebtedness or rights against any Security. Each Guarantor hereby waives all suretyship and other similar defenses.

**GENERAL PROVISIONS.** 1. **Application.** The following General Provisions apply to this entire Agreement including the promissory note, security agreement and guaranties.

2. **Powers and Authority.** Each Borrower and Guarantor represents and warrants that he/she/it has the power and authority to incur the obligations hereunder and to execute, deliver and perform this Agreement, and certify that each of their signatures hereto are genuine. The execution and delivery by Borrower and Guarantor of this Agreement will not contravene or violate any law or any contract to which Borrower or Guarantor are a party.

3. **Information to be Furnished.** Upon the request of Lender, Borrower and each Guarantor (when applicable) agree to furnish, or cause to be furnished, to Lender (a) annual financial statements in a form required by Lender setting forth the financial conditions and results of operation of Borrower and Guarantor within 60 days of the end of each calendar year; (b) copies of Borrower's and Guarantor's federal income tax returns within 30 days of their filing due dates; (c) annual financial statements of each Guarantor hereunder in the form required by Lender within 60 days after the end of each calendar year; and (d) such other financial information as Lender may from time to time reasonably request.

4. **Default Costs; Attorney Fees; Savings Clause.** Borrower agrees to pay to the order of Lender the following fees when incurred: (a) if any Indebtedness or portion thereof is not paid when due, Borrower agrees to pay Lender a late charge to compensate Lender for collecting and processing the late sum, such late charge being stipulated and liquidated at the greater of $.15 per dollar of such late sum or $15.00, plus an interest charge of 1.25% per month for every month after the first month in which the sum is late, (b) a returned check charge equal to the greater of $50.00 or the actual bank charges to Lender at the time the check is returned for any reason, including without limitation, nonsufficient or uncollected funds, (c) a collection call charge of $20.00 per call to compensate Lender for the time and expense of making any such call, (d) a personal visit charge of up to $750.00 to compensate Lender for the time and expense in making such visit, (e) other amounts allowed by applicable law, including without limitation, costs of foreclosure and of obtaining a judgment for money damages, (f) fees and costs of attorneys employed by Lender for any purpose related to this Agreement or the Indebtedness, including consultation, drafting documents, sending notices or instituting, prosecuting or defending any proceedings. Such proceedings include any arbitration, collection, bankruptcy, civil action, mediation, and counterclaim in which Lender prevails or post judgment action or appeal with respect to any of the foregoing. The fees and charges payable to Lender under this Section are in addition to such other interest, fees and charges that Lender may assess against Borrower pursuant to other provisions of this Agreement. Notwithstanding any provision in this Agreement to the contrary, the aggregate amount of all interest, fees, penalties, expenses and other charges payable by Borrower to Lender hereunder (collectively, "Costs") shall not exceed the maximum amount permitted under applicable law ("Maximum Rate"). If the aggregate amount of all Costs would otherwise exceed the Maximum Rate, such amounts shall be reduced, in a manner selected by Lender in its sole and absolute discretion, to equal in the aggregate the maximum amount permitted under applicable law and this Agreement shall be deemed reformed and modified to reflect such reduction. No party bound by this Agreement shall have an action or remedy against Lender for any damages whatsoever or any defense to the enforcement of this Agreement or other documents given in connection herewith arising out of the payment or collection of any interest in excess of the Maximum Rate. In determining whether interest paid or payable hereunder exceeds the Maximum Rate, Borrower agrees to exclude voluntary prepayment fees from the calculation of interest and to spread the total amount of interest throughout the entire contemplated Term.

5. **Events of Default.** The following shall be events of default hereunder ("Events of Default"): (a) failure to make any payment of the Indebtedness within 10 days after it first becomes due; (b) Borrower or any Guarantor defaults in the performance of any of their obligations or breaches any representation, covenant, or warranty under this Agreement or any other agreement with Lender or any affiliate of Lender; (c) the loss, theft, destruction, sale, assignment or unpermitted encumbrance of or on any Collateral; (d) attachment, execution or levy on any Collateral; (e) dissolution, termination of existence, insolvency, business failure, appointment of a receiver of any part of the property of Borrower or any Guarantor, assignment for the benefit of creditors by or the commencement of any proceedings under any bankruptcy or insolvency laws by or against Borrower or any Guarantor; (f) Borrower or any Guarantor dies, stops doing business as a going concern


Sky
Financial
Solutions

merges, consolidates, transfers all or substantially all of its assets to a third party or undergoes a substantial deterioration of financial condition; (g) an amendment or termination relating to a filed financing statement describing any of the Collateral is improperly filed by Borrower or Guarantor; or (h) Lender deems itself insecure for any other reason.

6.   **Remedies on Default.** Upon the occurrence of an Event of Default, Lender may at its option, exercise one or more of the following remedies without notice or demand, except as required by law: (a) cease making additional advances under this Agreement; (b) declare all Indebtedness immediately due and payable; (c) charge interest at the Default Rate on all Indebtedness; (d) exercise all of Lender's rights and remedies as a secured party, including the right to enter any premises where the Collateral may be located without legal process and take possession of and remove the Collateral which, upon request of Lender, Borrower agrees to assemble and to make available at a place designated by Lender; (e) sell, lease or otherwise dispose of any Collateral at public or private sale and collect any deficiency balance with or without resorting to legal process; (f) exercise any other right or remedy available to Lender at law or in equity, including without limitation, the right of set-off.   Lender has no obligation to clean up or otherwise prepare the Collateral for sale.  Lender has no obligation to attempt to satisfy the Indebtedness by collection from any other person liable therefore and Lender may release, modify or waive any Security without affecting Lender's rights against Borrower or Guarantor, each of whom waive any right he/she/it may have to require Lender to pursue any third person for any of the Indebtedness.  Lender may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be construed to adversely affect the commercial reasonableness of any sale of the Collateral. Lender may sell the Collateral without giving any warranties with respect thereto and may specifically disclaim any warranties of title or the like.  This procedure will not be construed to adversely affect the commercial reasonableness of any sale of the Collateral.  If Lender sells any of the Collateral on credit, Borrower will be credited only with payments actually made by the purchaser, received by Lender and applied to the indebtedness of the purchaser.  If the purchaser fails to pay for the Collateral, Lender may resell the Collateral and the Indebtedness shall be credited with the proceeds of the sale.  If Lender purchases any of the Collateral, Lender may pay for the Collateral by crediting some or all of the Indebtedness.  Lender shall have no obligation to marshall any assets in favor of Borrower or against Borrower or in payment of this Agreement, any of the other Indebtedness, or any other obligation owed to Lender by Borrower or any other person.

7.   **Waivers.** No delay or omission by Lender in exercising any right or remedy hereunder shall impair any right or remedy, waive or operate as an acquiescence to the Event of Default or affect any subsequent default of the same or a different nature.

8.   **Choice of Law, Jurisdiction; Venue.**  This Agreement and all matters arising out of, resulting from or in any way connected with this Agreement, the Indebtedness, the Collateral, the Security and the relationship between Borrower, Guarantor and Lender shall be governed by, interpreted under and construed in accordance with the internal laws of the State of Ohio.  Borrower and Guarantor shall select and consent to be subject to the personal jurisdiction of any state or federal court selected by Lender or its assignee and located in the State of Ohio or in any other state in which Lender or its assignee conducts business, so that trial shall be by and only to the court selected by Lender or its assignee.

9.   **JURY WAIVER.  BORROWER AND GUARANTOR EACH EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY AND THIS WAIVER IS A MATERIAL INDUCEMENT TO LENDER'S EXTENDING THE INDEBTEDNESS AND OTHER FINANCIAL ACCOMMODATIONS TO BORROWER.**

10.   **Consent to Service of Process.**  Borrower and Guarantor agree that any process served for any action or proceeding hereunder shall be valid if mailed by certified mail, return receipt requested, with delivery restricted to either the addressee, its registered agent or any agent appointed in writing to accept such process.

11.   **Lender's Liability; Indemnity.**  Lender shall not be liable to Borrower or any Guarantor for any indirect, consequential, punitive, or special damages of any kind or nature arising in connection with this Agreement, the Collateral, the Indebtedness or the Security.  Borrower hereby agrees to indemnify, defend and hold Lender, its parent and affiliates, and its and their officers, directors, employees and agents harmless from and against all loss, liability and expense, including reasonable attorney's fees, of whatever kind and nature, imposed on, incurred by or asserted against Lender that in any way relate to or arise out of this Agreement, the consummation of the transactions contemplated hereby or the Collateral, including but not limited to (a) the selection, manufacture, purchase, acceptance or rejection of any item of Collateral or the ownership of the Collateral; (b) the delivery, lease, possession, maintenance, use, condition, return or operation of the Collateral; (c) payment of property, use, franchise or other taxes imposed on the Collateral when payment of said taxes is demanded or requested from Lender by any taxing authority; (d) any patent or copyright infringement; (e) the conduct of Borrower, its officers, employees and agents; and (f) a breach by Borrower of any of its covenants or obligations hereunder. This provision shall survive expiration or termination of this Agreement.

12.   **Financial Statements; Credit Reports.** Financial information and other statements provided to Lender by credit application or otherwise are true, complete and correct, present fairly the financial position of Borrower and Guarantor as of their respective dates, and no material adverse change has occurred in the financial condition of Borrower or Guarantor since the furnishing of such information. Borrower and each Guarantor are currently meeting all of their debts as they come due. Borrower and each Guarantor authorize Lender to obtain, at Borrower and Guarantor's cost, and exchange with its affiliates and with non-Lender affiliates, credit reports or information contained therein, including consumer credit reports, in connection with this Agreement, and for periodic reviews, updates, renewals, extensions and collections.

13.   **Life and Disability Insurance.**  If required by Lender, Borrower shall obtain level premium term life insurance on the life Borrower for the Term in the face amount of the Principal Amount.  Halfway through the Term, Borrower may request a decrease in the face value of the life insurance policy to the amount of the remaining payments under this Agreement. If required by Lender, Borrower shall obtain disability insurance on Borrower for the Term in the amount of 60% of the largest payment due hereunder.  Lender shall be collaterally assigned under such policies.  The benefits paid under such insurance policies shall be applied to the total of all payments due hereunder during the Term.   Borrower appoints Lender as Borrower's attorney-in-fact to make any claim for, receive payment of or execute or endorse all documents, checks, drafts or returns of premium under such insurance.  If Borrower fails to obtain and/or assign the insurance(s) required hereunder, in

JUN. 3.2003    5:20PM    SK    NANCIAL                                    NO.201    P.8/9



addition to Lender's other remedies herein, Lender may obtain required insurance(s) on Borrower's behalf and as its agent. Lender may: (1) require Borrower to pay those premiums in full upon written demand by Lender to Borrower; (2) add the total amount of those premiums to the Principal Amount, or (3) add the amount of the premiums for obtaining and maintaining the required insurances to the Borrower's Monthly Payments. An administration fee of 10% will be added to the premium amounts charged under any policy of insurance obtained and maintained by Lender on Borrower's behalf.

14. **Binding Effect; Assignment; Execution.** This Agreement is binding upon and shall inure to the benefit of Borrower, Guarantor and Lender and each of their respective successors, heirs, personal representatives and permitted assigns, if any. Lender may rely upon an electronically authorized signature or consent by Internet or a facsimile signature telecopied to Lender by or on behalf of Borrower or any Guarantor as an authentic signature evidencing a binding and enforceable agreement. Borrower and Guarantor may not assign this Agreement. Lender may assign its rights and obligations under this Agreement at any time. Borrower agrees that the rights of Lender's assignee will not be subject to claims, defenses or setoffs that Borrower may have against Lender. Borrower will pay Lender's assignee hereunder regardless of any claims, defenses or setoffs that Borrower may have against Lender. Borrower agrees that Lender is not an agent of Lender's assignee and that Lender has no affiliation with such assignee except for such assignment.

15. **Disclaimer of Warranties.** Lender makes no warranty or representation, either express or implied, as to the value, design, condition, merchantability or fitness for a particular purpose or fitness for use of the Collateral or any other warranty or representation, express or implied, with respect thereto. In no event shall Lender be liable for any loss or damage in connection with or arising out of this Agreement, the Collateral or the existence, furnishing, functioning or Borrower's use of any item or products or services provided for in this Agreement.

16. **Miscellaneous.** The liability of each Borrower and each Guarantor is joint and several for the payment and performance of all of Borrower's obligations under this Agreement. Borrower and Guarantor agree that there are no other conditions or understandings which are not expressed in this Agreement. The declaration of invalidity of any provision of this Agreement shall not affect any part of the remainder of its provisions. Until Lender and Borrower notify each other of any new address in writing, any written communication is validly given when sent by facsimile transmission or when mailed postage prepaid by first class, overnight or certified mail to the address provided herein for such party. Lender's rights are cumulative and may be exercised together, separately, and in any order. Borrower agrees and covenants that it will, subsequent to the closing of Borrower's loan hereunder and disbursement of loan proceeds under this Agreement, complete and fulfill any uncompleted and unfulfilled terms, provisions or conditions contained in the Credit Conditions and Funding Requirements issued by Lender to Borrower, within any period of time prescribed by Lender.

17. **Prepayments and Partial Payments.** Borrower may not prepay the Indebtedness in whole or in part during the first 3 years of this Agreement. Thereafter, Borrower may prepay the Indebtedness in whole only by paying Lender an amount equal to: (a) the then outstanding Principal Amount, plus accrued interest computed on a simple interest basis and any other sums due Lender at the time of prepayment, plus (b) a prepayment premium equal to 4% of the original Principal Amount, if prepayment occurs in years four or five from the Acceptance Date, and 2% of the original Principal Amount if prepayment occurs after year five from the Acceptance Date. Borrower shall pay the prepayment premium due hereunder whether the prepayment is voluntary or involuntary.



**Sky** *Financial Solutions*

## ASSET PURCHASE AUTHORIZATION & ACCEPTANCE

Borrower agrees that as of the Acceptance Date: (a) Borrower has received and inspected any Equipment purchased with the proceeds of this loan, (b) such Equipment is in good working order and complies with the purchase orders/contracts, (c) Borrower irrevocably accepts the Equipment for purposes of this loan "as-is, where-is, with all faults," and (d) Borrower unconditionally waives any right it may have to revoke its acceptance of the Equipment.

| MEDLINE/R.A.R.E. |
|---|

Please initial below if you also participate in Lender's Medline or R.A.R.E. program. By initialing in the space provided, Borrower acknowledges that it has received and reviewed the Revolving Line of Credit Agreement and/or Preferred Purchase Revolving Line of Credit Agreement and consents to and agrees to be bound by all terms and conditions thereof.

Please initial [ ]

Authorized Signature of Borrower(s):

X _Nkemijika Obiechina_    Print Name: __Nkemijika Obiechina__    Date: _____
West 86th Street Dentistry, P.C. *Please sign in BLUE ink*

X _____    Print Name: _____    Date: _____

**Box 8  GUARANTOR (S)**
Signature of Guarantor(s):

X _Nkemijika Obiechina_    Print Name: __Nkemijika Obiechina__    Date: _____
Nkemijika Obiechina *Please sign in BLUE ink*

X _____    Print Name: _____    Date: _____

X _____    Print Name: _____    Date: _____

**Box 9**
This Agreement is not binding and effective until fulfillment of all conditions set forth in subsection 2 captioned "Conditions Precedent to Loan" under the Section captioned "PROMISSORY NOTE", final credit approval of Lender, and acceptance by Lender, its assignee or nominee at its Ohio office, by its signature below.
ACCEPTANCE BY SKY BANK:
Authorized Signature:

X _____   Agent   06-17-03
Sign Name and Title               Date

# EXHIBIT C



# Finance Agreement

**Box 1**

BORROWER: (Legal Name): West 86th Street Dentistry, P.C.

**Box 2**

ADDRESS: 2 West 86th Street

BUSINESS PHONE: (212) 362-1493

ADDRESS: Suite # 3

HOME PHONE: (201) 413-5309

CITY: New York        ST: NY        ZIP: 10024        COUNTY:

**Box 3**

TYPE OF ORGANIZATION:

**Box 3 (con't)**

STATE OF ORGANIZATION: NY

| Box 4 | Box 5 | Box 6 | Box 7 |
|---|---|---|---|
| PRINCIPAL AMOUNT | TERM | MONTHLY PAYMENT | ADVANCE PAYMENT |
| $26,900.00 | 84 (Months) | 4 months @ $0.00<br>8 months @ $186.00<br>12 months @ $373.00<br>60 months @ $532.00 | $0.00 |

ADDITIONAL PROVISIONS:
A balloon payment equal to <u>10%</u> of the Principal Amount is due and payable on the same date as the final payment under this Agreement.
DESCRIPTION OF ASSET (S) All assets now owned or hereafter acquired, including but not limited to, the dental practice located at 2 West 86th Street Suite # 3 New York, NY 10024



**DISCLAIMER:** No supplier, broker or salesperson is an agent of Lender or its assignee with respect to the Indebtedness, as defined herein, nor are they authorized to waive or alter the terms of this Agreement. Their representatives shall in no way affect Borrower's or Lender's rights and obligations as herein set forth. Borrower acknowledges that Borrower independently selected and determined the suitability of the Indebtedness for Borrower's intended use, without being advised by Lender.

This Finance Agreement (this "Agreement") is the promissory note, security agreement and personal guaranty, all of which are to be construed together and are binding upon the parties hereto. This Agreement is prepayable after year 3 of its Term, subject to the terms and conditions herein contained. Borrower and any Guarantor have read and accepted all terms of this Agreement prior to signing it. This Agreement is being executed for business purposes and not for personal family, household or agricultural purposes. Time is of the essence in Borrower's and Guarantor's performance of their

Sky
Financial
Solutions

obligations hereunder and under all related instruments and documents executed and/or delivered pursuant hereto and any renewals or extensions thereof.

**DEFINITIONS:** As used in this Agreement, the capitalized terms set forth below shall have the following meanings: (a) *"Acceptance Date"* means the date set forth in box 9; (b) *"Borrower"* means the individual or entity whose name appears in box 1, and its successors and assigns; (c) *"Collateral"* means all personal property of Borrower wherever located, and whether now owned or hereafter acquired, including without limitation: (i) Accounts, including health-care insurance receivables; (ii) Chattel Paper; (iii) Inventory; (iv) Equipment; (v) Instruments; (vi) Investment Property; (vii) Documents, including patient lists, records and files; (viii) Deposit Accounts; (ix) General Intangibles, including patient lists, records and files; (x) Supporting Obligations; (xi) the assets described in the Description of Asset(s) text box above; and (xii) to the extent not listed above as original Collateral, proceeds and products of the foregoing, including but not limited to, payments from insurance claims for the loss, damage or destruction of any of the Collateral. Any term used in the UCC and not defined in this Agreement has the meaning given to the term in the UCC, as the same may be amended from time to time; (d) *"Contract Balance"* means the sum total of all Monthly Payments of principal and interest due over the Term; (e) *"Default Rate"* means the lesser of (i) 5 percentage points above the Effective Rate; or (ii) the maximum rate of interest permitted by applicable state law; (f) *"Effective Rate"* means the fixed rate of interest that is sufficient to fully amortize the Principal Amount less the balloon payment set forth in the Additional Provisions text box above, if any, borrowed over the Term at the Monthly Payment; (g) *"Guarantor"* means, collectively, jointly and severally, the individual or individuals whose names appear in box 8, or on any other guaranty agreement related to this Agreement; (h) *"Indebtedness"* means the Principal Amount plus all interest, fees and expenses due or to become due Lender pursuant to the terms hereof and also any and all other liabilities of Borrower to Lender or any affiliate of Lender, whether now existing or hereafter arising, absolute or contingent, due or to become due, including all interest, fees and expenses incurred in connection therewith; (i) *"Lender"* means Sky Bank, an Ohio banking corporation, and its successors and assigns; (j) *"Maturity Date"* means the final day of the Term; (k) *"Monthly Payment"* means the amount set forth in box 6 above; (l) *"Payment Date"* means the day of the month scheduled by Lender for the Monthly Payment; (m) *"Principal Amount"* means the amount set forth in box 4 above; (n) *"Security"* means all guaranties of any Indebtedness, all interests of Lender in the Collateral and all other agreements, rights, or interests insuring or guaranteeing payment of any Indebtedness or giving the Indebtedness priority over the repayment or performance of other obligations of Borrower; (o) *"Term"* means the period from the Acceptance Date until the Maturity Date; and (p) *"UCC"* means the Uniform Commercial Code, as the same may be amended from time to time.

**PROMISSORY NOTE: 1. Loan.** Subject to the terms and conditions set forth herein, Lender shall loan to Borrower the Contract Balance. Borrower, for value received, promises to pay the Indebtedness to the order of Lender in accordance with the terms of this Agreement.

**2. Conditions Precedent to Loan.** The obligation of Lender to advance the Principal Amount is subject to all of the conditions and requirements of this Agreement and delivery of the following required documents or other action, all of which are conditions precedent: (a) upon the request of Lender, if Borrower is a corporation, a certified resolution of Borrower's Board of Directors duly authorizing the execution, delivery and performance of all of the documents required hereunder, or, if Borrower is a partnership or a limited liability company, resolutions of Borrower's partners or members, as applicable, duly authorizing the execution, delivery and performance of all of the documents required hereunder, (b) UCC financing statements duly executed on Borrower's behalf, if required, (c) upon Lender's request, the execution and delivery of such other instruments, documents, agreements or guaranties as Lender may deem necessary or appropriate to consummate or implement the transactions contemplated hereby; (d) completion or fulfillment of any conditions listed in the Additional Provisions text box above; (e) Borrower shall have taken such other action as Lender may reasonably require to perfect its security interest in the Collateral and shall have paid all costs incident thereto; and (f) completion and fulfillment by Borrower of all terms, provisions, and conditions of the Credit Conditions and Funding Requirements issued by Lender to Borrower.

**3. Interest.** Interest will be charged at the Effective Rate on all unpaid Indebtedness, except that Borrower shall pay interest at a rate equal to the Default Rate on any Indebtedness not paid when due and on any judgment obtained by Lender against Borrower or Guarantor pursuant to this Agreement. The amount of interest to be paid by the Borrower is equal to the difference between the sum of all Monthly Payments and the Principal Amount. Borrower agrees to pay Lender interest at the Effective Rate on the Principal Amount from the Acceptance Date to the first Payment Date.

**4. Scheduled Payments.** The Contract Balance, plus all unpaid accrued interest, fees and other charges permitted in this Agreement, shall be due and payable in full on the Maturity Date. Until the Maturity Date, Borrower shall make Monthly Payments to Lender on or before each Payment Date during the Term. All such sums due and payable by Borrower to Lender shall be applied first to reduce the then outstanding Contract Balance, and second, to any outstanding fees, charges, and expenses permitted under this Agreement. Any payment received in advance of the Acceptance Date will be applied to the last payment due under this Agreement. Borrower shall make all scheduled payments to Lender at such address as Lender may designate in writing from time to time.

Lender can accept late or partial payments, as well as payments marked "paid in full" or with other restrictive endorsements, without losing any of its rights under this Agreement. Any payment of a smaller sum than due, and/or any partial payment intended as a payment in full of a disputed amount under the Indebtedness, regardless of any endorsement restriction, will not constitute an accord and satisfaction, and must be sent to: Sky Financial Solutions, Inc., 2740 Airport Drive, Suite 300, Columbus, Ohio 43219-2286, Attention: Customer Service Manager. Any communication with Lender concerning the Borrower's dispute of any amounts due under the Indebtedness, as well as any payments of less than the full amount due and payable hereunder, must be sent to the address set forth in the preceding sentence. All other payments the Borrower makes towards the Indebtedness are to be mailed to the address the Lender sets forth on the Borrower's monthly billing statement.





**5.  Payment Adjustments.** Borrower hereby authorizes Lender to adjust the Monthly Payment proportionately upward or downward if the Principal Amount changes after the Acceptance Date.  Lender shall notify Borrower in writing of any such adjustment.

**6.  Waiver of Presentment, etc.** Borrower hereby waives presentment for payment, demand, notice of nonpayment, notice of dishonor, protest, notice of protest and all other notices in connection with the delivery, acceptance, performance, default or enforcement of this Agreement or any payment made pursuant to its terms.

**7.  Unconditional Obligation.** Borrower agrees that its obligation to make payments to Lender hereunder is absolute and unconditional, under all circumstances whatsoever, and shall not be affected by any defect in the condition, design or operation of the Collateral, any lack of maintenance or service of any Collateral, or any setoff, counterclaim, defense or reduction which Borrower may have against Lender, or any supplier, servicer, broker, salesperson or other third party.

**8.  Set-Up Fee.** Borrower agrees to pay Lender a standard set-up fee of up to 1.75% of the Principal Amount, as compensation for Lender's costs in connection with approval and documentation of the Indebtedness.

**SECURITY AGREEMENT: 1.  Security Interest.** Lender grants Lender a security interest in the Collateral and the proceeds of the Collateral to secure payment and performance of the Indebtedness.

**2.  Representations, Warranties and Covenants.** Borrower and any Guarantor, when applicable, represent, warrant, covenant and agree that: (a) the Collateral shall be kept at the location specified in box 2 above, Borrower shall promptly notify Lender of any change in the location of the Collateral, and Borrower shall not remove the Collateral from said location without the prior written consent of Lender, except for Inventory sold in the ordinary course of business; (b) the chief executive office and state of organization of Borrower are as set forth in boxes 2 and 3 above, and Borrower shall not relocate its chief executive office or change its state of organization without providing Lender with 30 days prior written notice; (c) except for the security interest granted hereby, and except as otherwise disclosed in writing to Lender, Borrower is the owner of the Collateral, free from any prior lien, security interest or encumbrance; and Borrower will defend the Collateral against all claims and demands of any and all persons at any time claiming the Collateral or any interest therein; (d) except for sales of Inventory in the ordinary course of business, Borrower will not sell, exchange, lease or otherwise dispose of any interest in the Collateral without the prior written consent of Lender and shall not, without the consent of Lender, permit any lien, security interest or encumbrance to attach to the Collateral; (e) Borrower authorizes Lender to file a financing statement describing the Collateral and, if Lender has pre-filed a financing statement with respect thereto, Borrower hereby ratifies such filing.  Borrower hereby waives any right that Borrower may have to file with the applicable filing officer any financing statement, amendment, termination or other record pertaining to the Collateral and/or Lender's interest therein.  Borrower will cooperate with Lender in obtaining control of any Collateral in which a security interest may be perfected by possession or control and will, at Borrower's expense, make and do all such acts and things as Lender may from time to time request for the better evidencing, perfection, protection or validation of or realization of the benefits of, its security interest.  At the request of Lender, Borrower shall join with Lender in executing one or more financing statements, or amendments thereto, for the Collateral pursuant to the requirements of the UCC, in form satisfactory to Lender.  A carbon, photographic or other reproduction of this Agreement or a financing statement shall be sufficient as a financing statement.  Borrower hereby appoints Lender or its designee, with full power of substitution, as Borrower's attorney-in-fact to execute UCC financing statements in Borrower's name and to perform all other acts that Lender deems necessary or appropriate to perfect and protect Lender's security interest in the Collateral.  Said appointment is coupled with an interest with full power of substitution, and is irrevocable.

**3.  Maintenance, Insurance, and Taxes.** Borrower shall maintain the Collateral in good condition and repair.  Borrower shall, at Borrower's expense, maintain insurance on the Collateral against fire, theft, and such other hazards and in such form and amount as Lender may require.  The amount of such insurance shall be not less than the greater of (a) the fair market value of the Collateral, or (b) the aggregate amount of outstanding Indebtedness.  Lender shall be named as an additional insured and/or as loss payee on all policies of Insurance required hereunder.  The proceeds of such insurance shall be applied, at Lender's sole election, toward the replacement or repair of the Collateral or to reduce Borrower's then outstanding Indebtedness.  Borrower hereby appoints Lender as Borrower's attorney-in-fact to make any claim for, receive payment of, or execute or endorse all documents, checks or drafts for loss or damage or return of premium under such insurance.  Each insurance policy shall provide that the insurance policy cannot be cancelled without 30 days' prior written notice to Lender.  Borrower agrees to furnish to Lender proof of each insurance policy insuring the Collateral by providing to Lender a copy of the certificate of insurance or the policy itself within 10 days following the date hereof.  Lender shall have the right, but not the obligation, to purchase insurance on the Collateral in such amounts, from such insurers and for such premiums, as Lender may deem appropriate.  Borrower agrees to promptly reimburse Lender for all costs incurred in connection with obtaining such insurance plus an administrative fee of $25.00 each month until Borrower provides evidence of such insurance.  Payment of such fee does not relieve Borrower from its obligation to obtain insurance.  Borrower shall pay and discharge when due all taxes imposed on the Collateral.  Further, Lender may discharge taxes, liens or other encumbrances at any time levied or placed on the Collateral and pay for the maintenance and preservation of the Collateral should Borrower fail to do so.  Borrower agrees to promptly reimburse Lender on demand for any payment so made, and until such reimbursement, the amount so paid by Lender shall be added to the Principal Amount of the Indebtedness.

**UNCONDITIONAL GUARANTY. 1.  Guaranty.** Each Guarantor absolutely, unconditionally, jointly and severally guarantees the prompt payment when due of all Indebtedness.  If Borrower fails to pay all or any part of any Indebtedness when due, Guarantor shall immediately pay to Lender the outstanding balance of all Indebtedness, regardless of whether or not Lender first pursues Borrower or exhausts any of its rights or remedies against Borrower or other Security.  If Guarantor consists of more than one individual or entity, each Guarantor shall be jointly and severally liable to Lender with respect to all guaranteed obligations, including, without limitation, the Indebtedness.

Option 1 - Revised 04/02                              Page 3 of 7



JUL. 29. 2007 11:31AM                                          NO. 9170   P. 8/12



2. **Inducement to Lender.** Each Guarantor (a) acknowledges that Lender would not have extended any credit, including credit evidenced by the Indebtedness, to Borrower but for the guaranty; (b) represents and warrants that Guarantor has given it's guaranty to induce Lender to extend and to continue to extend credit to Borrower hereunder; (c) agrees that Lender may rely on the guaranty in extending future credit to Borrower; and (d) represents and warrants that each Guarantor has received good and valuable consideration for the guaranty; (e) waives acceptance of the guaranty; (f) represents and warrants that Guarantor has not given the guaranty in reliance upon the existence of any Security; (g) acknowledges receipt of notice of all Indebtedness existing before this date; (h) waives notice of any increases in the Indebtedness incurred after this date; and (i) waives protest and all other notices of failure to pay the Indebtedness or to perform any agreement relating to any Indebtedness or the Security.

3. **No Reliance.** Each Guarantor (a) warrants that he/she/it has not relied on any information about Borrower, the Security, or any other guarantor of the Indebtedness in providing its guaranty of the Indebtedness; (b) warrants that Guarantor has had ample opportunity to investigate Borrower, Borrower's affairs, the Security, and the effect that the Indebtedness will have on Borrower; and (c) agrees that Lender has _no_ obligation to provide Guarantor any information about Borrower or the Security.

4. **Lender's Actions.** Without notice to or the consent of any Guarantor, Lender may do or refrain from doing anything affecting any Indebtedness or any Security, including, without limitation, the following: (a) granting or not granting any indulgences to anyone liable for payment of any Indebtedness or any Security; (b) failing to obtain or to perfect any Security; (c) failing to obtain an enforceable agreement to repay any Indebtedness; (d) releasing any Security or anyone or any property from liability for payment of any Indebtedness; (e) changing any agreement relating to any Indebtedness or any Security; (f) extending the time for payment of any Indebtedness; and (g) delaying in enforcing or failing to enforce any rights to payment of any Indebtedness or rights against any Security. Each Guarantor hereby waives all suretyship and other similar defenses.

**GENERAL PROVISIONS. 1. Application.** The following General Provisions apply to this entire Agreement including the promissory note, security agreement and guaranties.

2. **Powers and Authority.** Each Borrower and Guarantor represents and warrants that he/she/it has the power and authority to incur the obligations hereunder and to execute, deliver and perform this Agreement, and certify that each of their signatures hereto are genuine. The execution and delivery by Borrower and Guarantor of this Agreement will not contravene or violate any law or any contract to which Borrower or Guarantor are a party.

3. **Information to be Furnished.** Upon the request of Lender, Borrower and each Guarantor (when applicable) agree to furnish, or cause to be furnished, to Lender (a) annual financial statements in a form required by Lender setting forth the financial conditions and results of operation of Borrower and Guarantor within 60 days of the end of each calendar year; (b) copies of Borrower's and Guarantor's federal income tax returns within 30 days of their filing due dates; (c) annual financial statements of each Guarantor hereunder in the form required by Lender within 60 days after the end of each calendar year; and (d) such other financial information as Lender may from time to time reasonably request.

4. **Default Costs; Attorney Fees; Savings Clause.** Borrower agrees to pay to the order of Lender the following fees when incurred: (a) if any Indebtedness or portion thereof is not paid when due, Borrower agrees to pay Lender a late charge to compensate Lender for collecting and processing the late sum, such late charge being stipulated and liquidated at the greater of $.15 per dollar of such late sum or $15.00, plus an interest charge of 1.25% per month for every month after the first month in which the sum is late, (b) a returned check charge equal to the greater of $50.00 or the actual bank charges to Lender at the time the check is returned for any reason, including without limitation, nonsufficient or uncollected funds, (c) a collection call charge of $20.00 per call to compensate Lender for the time and expense of making any such call, (d) a personal visit charge of up to $750.00 to compensate Lender for the time and expense in making such visit, (e) other amounts allowed by applicable law, including without limitation, costs of foreclosure and of obtaining a judgment for money damages, (f) fees and costs of attorneys employed by Lender for any purpose related to this Agreement or the Indebtedness, including consultation, drafting documents, sending notices or instituting, prosecuting or defending any proceedings. Such proceedings include any arbitration, collection, bankruptcy, civil action, mediation, and counterclaim in which Lender prevails or post judgment action or appeal with respect to any of the foregoing. The fees and charges payable to Lender under this Section are in addition to such other interest, fees and charges that Lender may assess against Borrower pursuant to other provisions of this Agreement. Notwithstanding any provision in this Agreement to the contrary, the aggregate amount of all interest, fees, penalties, expenses and other charges payable by Borrower to Lender hereunder (collectively, "Costs") shall not exceed the maximum amount permitted under applicable law ("Maximum Rate"). If the aggregate amount of all Costs would otherwise exceed the Maximum Rate, such amounts shall be reduced, in a manner selected by Lender in its sole and absolute discretion, to equal in the aggregate the maximum amount permitted under applicable law and this Agreement shall be deemed reformed and modified to reflect such reduction. No party bound by this Agreement shall have an action or remedy against Lender for any damages whatsoever or any defense to the enforcement of this Agreement or other documents given in connection herewith arising out of the payment or collection of any interest in excess of the Maximum Rate. In determining whether interest paid or payable hereunder exceeds the Maximum Rate, Borrower agrees to exclude voluntary prepayment fees from the calculation of interest and to spread the total amount of interest throughout the entire contemplated Term.

5. **Events of Default.** The following shall be events of default hereunder ("Events of Default"): (a) failure to make any payment of the Indebtedness within 10 days after it first becomes due; (b) Borrower or any Guarantor defaults in the performance of any of their obligations or breaches any representation, covenant, or warranty under this Agreement or any other agreement with Lender or any affiliate of Lender; (c) the loss, theft, destruction, sale, assignment or unpermitted encumbrance of or on any Collateral; (d) attachment, execution or levy on any Collateral; (e) dissolution, termination of existence, insolvency, business failure, appointment of a receiver of any part of the property of Borrower or any Guarantor, assignment for the benefit of creditors by or the commencement of any proceedings under any bankruptcy or insolvency laws by or against Borrower or any Guarantor; (f) Borrower or any Guarantor dies, stops doing business as a going concern,





merges, consolidates, transfers all or substantially all of its assets to a third party or undergoes a substantial deterioration of financial condition; (g) an amendment or termination relating to a filed financing statement describing any of the Collateral is improperly filed by Borrower or Guarantor; or (h) Lender deems itself insecure for any other reason.

6. **Remedies on Default.** Upon the occurrence of an Event of Default, Lender may at its option, exercise one or more of the following remedies without notice or demand, except as required by law: (a) cease making additional advances under this Agreement; (b) declare all Indebtedness immediately due and payable; (c) charge interest at the Default Rate on all Indebtedness; (d) exercise all of Lender's rights and remedies as a secured party, including the right to enter any premises where the Collateral may be located without legal process and take possession of and remove the Collateral which, upon request of Lender, Borrower agrees to assemble and to make available at a place designated by Lender; (e) sell, lease or otherwise dispose of any Collateral at public or private sale and collect any deficiency balance with or without resorting to legal process; (f) exercise any other right or remedy available to Lender at law or in equity, including without limitation, the right of set-off. Lender has no obligation to clean up or otherwise prepare the Collateral for sale. Lender has no obligation to attempt to satisfy the Indebtedness by collection from any other person liable therefore and Lender may release, modify or waive any Security without affecting Lender's rights against Borrower or Guarantor, each of whom waive any right he/she/it may have to require Lender to pursue any third person for any of the Indebtedness. Lender may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be construed to adversely affect the commercial reasonableness of any sale of the Collateral. Lender may sell the Collateral without giving any warranties with respect thereto and may specifically disclaim any warranties of title or the like. This procedure will not be construed to adversely affect the commercial reasonableness of any sale of the Collateral. If Lender sells any of the Collateral on credit, Borrower will be credited only with payments actually made by the purchaser, received by Lender and applied to the indebtedness of the purchaser. If the purchaser fails to pay for the Collateral, Lender may resell the Collateral and the Indebtedness shall be credited with the proceeds of the sale. If Lender purchases any of the Collateral, Lender may pay for the Collateral by crediting some or all of the Indebtedness. Lender shall have no obligation to marshall any assets in favor of Borrower or against Borrower or in payment of this Agreement, any of the other Indebtedness or any other obligation owed to Lender by Borrower or any other person.

7. **Waivers.** No delay or omission by Lender in exercising any right or remedy hereunder shall impair any right or remedy, waive or operate as an acquiescence to the Event of Default or affect any subsequent default of the same or a different nature.

8. **Choice of Law, Jurisdiction; Venue.** This Agreement and all matters arising out of, resulting from or in any way connected with this Agreement, the Indebtedness, the Collateral, the Security and the relationship between Borrower, Guarantor and Lender shall be governed by, interpreted under and construed in accordance with the internal laws of the State of Ohio. Borrower and Guarantor shall select and consent to be subject to the personal jurisdiction of any state or federal court selected by Lender or its assignee and located in the State of Ohio or in any other state in which Lender or its assignee conducts business, so that trial shall be by and only to the court selected by Lender or its assignee.

9. **JURY WAIVER. BORROWER AND GUARANTOR EACH EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY AND THIS WAIVER IS A MATERIAL INDUCEMENT TO LENDER'S EXTENDING THE INDEBTEDNESS AND OTHER FINANCIAL ACCOMMODATIONS TO BORROWER.**

10. **Consent to Service of Process.** Borrower and Guarantor agree that any process served for any action or proceeding hereunder shall be valid if mailed by certified mail, return receipt requested, with delivery restricted to either the addressee, its registered agent or any agent appointed in writing to accept such process.

11. **Lender's Liability; Indemnity.** Lender shall not be liable to Borrower or any Guarantor for any indirect, consequential, punitive, or special damages of any kind or nature arising in connection with this Agreement, the Collateral, the Indebtedness or the Security. Borrower hereby agrees to indemnify, defend and hold Lender, its parent and affiliates, and its and their officers, directors, employees and agents harmless from and against all loss, liability and expense, including reasonable attorney's fees, of whatever kind and nature, imposed on, incurred by or asserted against Lender that in any way relate to or arise out of this Agreement, the consummation of the transactions contemplated hereby or the Collateral, including but not limited to (a) the selection, manufacture, purchase, acceptance or rejection of any item of Collateral or the ownership of the Collateral; (b) the delivery, lease, possession, maintenance, use, condition, return or operation of the Collateral; (c) possession of property, use, franchise or other taxes imposed on the Collateral when payment of said taxes is demanded or requested from Lender by any taxing authority; (d) any patent or copyright infringement; (e) the conduct of Borrower, its officers, employees and agents; and (f) a breach by Borrower of any of its covenants or obligations hereunder. This provision shall survive expiration or termination of this Agreement.

12. **Financial Statements; Credit Reports.** Financial information and other statements provided to Lender by credit application or otherwise are true, complete and correct, present fairly the financial position of Borrower and Guarantor as of their respective dates, and no material adverse change has occurred in the financial condition of Borrower or Guarantor since the furnishing of such information. Borrower and each Guarantor are currently meeting all of their debts as they come due. Borrower and each Guarantor authorize Lender to obtain, at Borrower and Guarantor's cost, and exchange with its affiliates and with non-Lender affiliates, credit reports or information contained therein, including consumer credit reports, in connection with this Agreement, and for periodic reviews, updates, renewals, extensions and collections.

13. **Life and Disability Insurance.** If required by Lender, Borrower shall obtain level premium term life insurance on the life Borrower for the Term in the face amount of the Principal Amount. Halfway through the Term, Borrower may request a decrease in the face value of the life insurance policy to the amount of the remaining payments under this Agreement. If required by Lender, Borrower shall obtain disability insurance on Borrower for the Term in the amount of 60% of the largest payment due hereunder. Lender shall be collaterally assigned under such policies. The benefits paid under such insurance policies shall be applied to the total of all payments due hereunder during the Term. Borrower appoints Lender as Borrower's attorney-in-fact to make any claim for, receive payment of or execute or endorse all documents, checks, drafts or returns of premium under such insurance. If Borrower fails to obtain and/or assign the insurance(s) required hereunder, in



addition to Lender's other remedies herein, Lender may obtain required insurance(s) on Borrower's behalf and as its agent. Lender may: (1) require Borrower to pay those premiums in full upon written demand by Lender to Borrower; (2) add the total amount of those premiums to the Principal Amount, or (3) add the amount of the premiums for obtaining and maintaining the required insurances to the Borrower's Monthly Payments. An administration fee of 10% will be added to the premium amounts charged under any policy of insurance obtained and maintained by Lender on Borrower's behalf.

14. **Binding Effect; Assignment; Execution.** This Agreement is binding upon and shall inure to the benefit of Borrower, Guarantor and Lender and each of their respective successors, heirs, personal representatives and permitted assigns, if any. Lender may rely upon an electronically authorized signature or consent by Internet or a facsimile signature telecopied to Lender by or on behalf of Borrower or any Guarantor as an authentic signature evidencing a binding and enforceable agreement. Borrower and Guarantor may not assign this Agreement. Lender may assign its rights and obligations under this Agreement at any time. Borrower agrees that the rights of Lender's assignee will not be subject to claims, defenses or setoffs that Borrower may have against Lender. Borrower will pay Lender's assignee hereunder regardless of any claims, defenses or setoffs that Borrower may have against Lender. Borrower agrees that Lender is not an agent of Lender's assignee and that Lender has no affiliation with such assignee except for such assignment.

15. **Disclaimer of Warranties.** Lender makes no warranty or representation, either express or implied, as to the value, design, condition, merchantability or fitness for a particular purpose or fitness for use of the Collateral or any other warranty or representation, express or implied, with respect thereto. In no event shall Lender be liable for any loss or damage in connection with or arising out of this Agreement, the Collateral or the existence, furnishing, functioning or Borrower's use of any item or products or services provided for in this Agreement.

16. **Miscellaneous.** The liability of each Borrower and each Guarantor is joint and several for the payment and performance of all of Borrower's obligations under this Agreement. Borrower and Guarantor agree that there are no other conditions or understandings which are not expressed in this Agreement. The declaration of invalidity of any provision of this Agreement shall not affect any part of the remainder of its provisions. Until Lender and Borrower notify each other of any new address in writing, any written communication is validly given when sent by facsimile transmission or when mailed postage prepaid by first class, overnight or certified mail to the address provided herein for such party. Lender's rights are cumulative and may be exercised together, separately, and in any order. Borrower agrees and covenants that it will, subsequent to the closing of Borrower's loan hereunder and disbursement of loan proceeds under this Agreement, complete and fulfill any uncompleted and unfulfilled terms, provisions or conditions contained in the Credit Conditions and Funding Requirements issued by Lender to Borrower, within any period of time prescribed by Lender.

17. **Prepayments and Partial Payments.** Borrower may not prepay the Indebtedness in whole or in part during the first 3 years of this Agreement. Thereafter, Borrower may prepay the Indebtedness in whole only by paying Lender an amount equal to: (a) the then outstanding Principal Amount, plus accrued interest computed on a simple interest basis and any other sums due Lender at the time of prepayment, plus (b) a prepayment premium equal to 4% of the original Principal Amount, if prepayment occurs in years four or five from the Acceptance Date, and 2% of the original Principal Amount if prepayment occurs after year five from the Acceptance Date. Borrower shall pay the prepayment premium due hereunder whether the prepayment is voluntary or involuntary.



JUL. 29. 2003 11:54AM                                                                    NO. 9170    P. 11/19



## ASSET PURCHASE AUTHORIZATION & ACCEPTANCE

Borrower agrees that as of the Acceptance Date: (a) Borrower has received and inspected any Equipment purchased with the proceeds of this loan, (b) such Equipment is in good working order and complies with the purchase orders/contracts, (c) Borrower irrevocably accepts the Equipment for purposes of this loan "as-is, where-is, with all faults," and (d) Borrower unconditionally waives any right it may have to revoke its acceptance of the Equipment.

---

**MEDLINE/R.A.R.E.**

Please initial below if you also participate in Lender's Medline or R.A.R.E. program.  By initialing in the space provided, Borrower acknowledges that it has received and reviewed the Revolving Line of Credit Agreement and/or Preferred Purchase Revolving Line of Credit Agreement and consents to and agrees to be bound by all terms and conditions thereof.

N.C
Please initial

---

Authorized Signature of Borrower(s)

X _Nkanyika Obiechina_        Print Name: _NKANYIKA OBIECHINA_  Date: _8/4/03_
Please sign in BLUE ink

X _____      Print Name: _____  Date: _____
Please sign in BLUE ink

Box 8 GUARANTOR (S)
Signature of Guarantor(s):

X _Nkemjika Obiechina_        Print Name: _NKEMJIKA OBIECHINA_  Date: _8/4/03_
Please sign in BLUE ink

X _____      Print Name: _____  Date: _____
Please sign in BLUE ink

X _____      Print Name: _____  Date: _____
Please sign in BLUE ink

---

Box 9
This Agreement is not binding and effective until fulfillment of all conditions set forth in subsection 2 captioned "Conditions Precedent to Loan" under the Section captioned "PROMISSORY NOTE", final credit approval of Lender, and acceptance by Lender, its assignee or nominee at its Ohio office, by its signature below.

ACCEPTANCE BY SKY BANK:
Authorized Signature:

X _Kyle Dean_        _Agent_    8/12/2003
Sign Name and Title                    Date

---

Option 1 - Revised 04/02                         Page 7 of 7

 

# EXHIBIT D

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] |
|---|
| Jessie Pozuelos |

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
UCC Direct Services
P. O. Box 29071
Glendale, CA  91209-9071
```

NY, Secretary of State

200306175121715

17-JUN-2003

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
200302210391774    2/21/2003

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☒ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.    ☐ DELETE name: Give record name to be deleted in item 6a or 6b.    ☒ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME  U.S. BANK TRUST NATIONAL ASSOCIATION | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

| 7c. MAILING ADDRESS 100 WALL STREET, 16TH FLOOR | CITY NEW YORK | STATE NY | POSTAL CODE 10005 | COUNTRY US |
|---|---|---|---|---|

| 7d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

As security for the payment of the indebtedness and all other indebtedness, obligations, and liabilities of Lessee to Lessor, now existing or hereafter arising, directly or indirectly, by operation of law or otherwise (collectively the "Liabilities"), Lessee assigns, transfers, pledges, hypothecates and grants to Lessor, its successors and assigns, a first priority security interest (the "Security Interest") in all Lessee's assets, including without limitation, all inventory, supplies, accounts, general intangibles, chattel paper and instruments, goods, asset, machinery, fixtures, furnishings, and all other personal property together with all other accessories, accessions, attachments and appurtenances, appertaining or attached thereto, whether now

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME  SKY BANK | | | |
|---|---|---|---|
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

10. OPTIONAL FILER REFERENCE DATA 75004126

8048751    Debtor name: WEST 86TH STREET DENTISTRY P C

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/29/98)

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

11. INITIAL FINANCING STATEMENT FILE # (same as item 1a on Amendment form)

200302210391774

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT (same as item 9 on Amendment form)

| 12a. ORGANIZATION'S NAME | | |
|---|---|---|
| SKY BANK | | |
| 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
| | | |

13. Use this space for additional Information

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

Additional Collateral Text: owned or hereafter acquired, and all other substitutions, renewals, replacements and improvements and all proceeds, rents, issuers, income, profits and avails, including without limitation, insurance proceeds. Further, borrower grants lender a purchase money security interest in specific equipment, furniture and fixtures purchased by borrower and financed by lender on or about filing date (collectively the "Collateral").

# EXHIBIT E

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
-------------------------------------------------X

**CENTRAL PARK WEST ASSOCIATES,**

      **Petitioner,**

  -against-

**NKEMJIKA S. OBIECHINA,**

      **Respondent.**
-------------------------------------------------X

**AFFIRMATION IN SUPPORT**

**INDEX NO.: 70714/06**

  **MATTHEW L. GORDON,** an attorney duly admitted to practice law before the Courts of the State of New York, does hereby affirm the following pursuant to CPLR §2106.

  1.  I am an associate with the law firm of NOVICK, EDELSTEIN, LUBELL, REISMAN, WASSERMAN & LEVENTHAL, P.C., the attorneys herein for the Petitioner.

  2.  This affirmation is respectfully submitted in support of the instant §5704 (b) application to this Court.

  3.  Petitioner commenced this proceeding in May 2006 seeking rent arrears for October 2005 through May 2006 plus outstanding electric charges and bounced check fees.

  4.  Respondent failed to answer the pleadings and Petitioner was awarded a default judgment and warrant.

  5.  Respondent was served with a Marshal's notice and in response she retained the law firm of Goldbeg, Scudieri, Lindenberg & Block, P.C. to represent her.

  6.  Respondent's counsel obtained an Order to Show Cause which was returnable in Part 52 on August 21, 2006. At that time the Court granted Respondents' Order to Show Cause to the extent of setting the matter down for a traverse hearing on September 18, 2006. Respondent was directed to pay August and September use and occupancy and electricity charges by August 28, 2006 and September 7, 2006. Copy of decision is annexed hereto as Exhibit "A".

7.    On September 18, 2006 the parties, after a lengthy conference, entered into a stipulation of settlement. The stipulation provided that after Respondent tendered $4,600.00 she owed $18,537.75 through September 30, 2006. Copy of stipulation is annexed hereto as Exhibit "B".

8.    The stipulation stayed the execution of the warrant provided Respondent paid her monthly rent plus electric charges by the 10th day of each month, commencing October 10, 2006, and to continue through January 10, 2007, and Respondent would pay ,by the 20th day of each month, commencing October 20, 2006 and to continue through January 20, 2007, $4,6334.38 toward the arrears.

9.    Respondent breached this agreement in October 2006 and a Notice of Default was faxed to Respondent's counsel on or about October 24, 2006. Copy of Notice of Default is annexed hereto as Exhibit "C".

10.    On or about February 1, 2007 another Notice of Default was served upon the Respondent's counsel, as once again Respondent failed to comply with the stipulation. Copy of Notice of Default is annexed hereto as Exhibit "D".

11.    Pursuant to the terms of the stipulation of September 18, 2006, Respondent was to pay $9,401.85 plus electric charges each month for October 2006 through January 2007. Since the stipulation was signed, Respondent paid $9,200.00 in November 2006 and $9,510.00 in December 2006, and $12,000.00 she was directed to pay by the Court on March 6, 2007.

12.    Respondent has been in breach of this agreement since the first month of the agreement. She has already received a seven month extension to pay the arrears owed through September. That was also on top of the extension she received when she failed to answer the pleadings in May 2006.

13.    Respondent did not cure her default and she was served with another Marshal's notice. Respondent's counsel then obtained a second Order to Show Cause herein, which was returnable in Part 52 on March 6, 2007.

14.    Respondent brought that motion by Order to Show Cause to stay the execution of the warrant. Upon an analysis of the merits of that motion, it was respectfully submitted that the Court was constrained to deny the same. Copy of Order to Show Cause annexed hereto as Exhibit "E".

15.    Respondent alleged on February 22, 2007 in her affidavit that she would have $15,000.00 by February 28, 2007 and the balance of February's rent by March 15, 2007. The only funds Respondent actually had at the time was $7,500.00.

16.    On March 6, 2007 the Order to Show Cause was assigned to the Hon. Shlomo S. Hagler. After conference, and argument of the motion, the parties entered into a stipulation upon the direction of the Court that adjourned the motion to March 20, 2007 for Respondent to pay $18,962.97, which was the balance of the arrears owed through March 31, 2007, after the Respondent was directed to pay $12,000.00 to Petitioner for the adjournment and the Court was to determine Petitioner's claim for additional legal fees. Copy of stipulation is annexed hereto as Exhibit "F".

17.    At that time the Respondent represented to the Court that she would have the $18,962.97 balance by March 15, 2007. The Court adjourned the case to March 20, 2007 for purposes of extending a few more days for Respondent to come up with the balance.

18.    On March 20, 2007 the Court denied Respondent's motion as she did not have the necessary funds as agreed to, as the Court had adjourned this matter two weeks for her to make said tender. Copy of decision is annexed hereto as Exhibit "G".

19.    On March 20, 2007 the Respondent had about $11,800.00 available.

20.    In the instant Order to Show Cause, Respondent is offering to pay even less monies presently than she was on March 20, 2007 when the Court denied her last Order to Show Cause, despite her now owing more money.

21.    Respondent is offering only to pay $9,000.00, and she would allegedly pay the balance of the rent by April 30, 2007.

22.    For some reason this Order to Show Cause was not presented to Judge Hagler for his signature, as it should have been. I do not believe, based on Judge Hagler's March 20, 2007 decision, that he would have signed the instant Order to Show Cause.

23.    I am sure the Hon. Ernest Cavallo, if he was aware of the history of this proceeding, would never have signed the instant application. Certainly from a reading of Respondent's affidavit, he could not get an accurate representation of what had transpired in this case. Particularly, Respondent conveniently omitted from her affidavit as to what transpired before Judge Hagler on March 20, 2007. Copy of Respondent's Order to Show Cause returnable in Civil Court on April 19, 2007 in Part 52 is annexed hereto as Exhibit "H".

24.    In fact, in Respondent's affidavit she fails to mention that her previous Order to Show Cause was denied on March 20, 2007 because she had failed to comply with the Court's stipulation.

25.    In fact, in paragraph no. 18 of Respondent's affidavit, Respondent perjures herself by stating that "this is the first application to this Court for the requested relief." This Order to Show Cause is in fact the second application for the same relief denied on March 20, 2007 by Judge Hagler.

26.    If Respondent is unhappy with Judge Hagler's decision of March 20, 2007, her remedy would be to file a notice of appeal. Respondent cannot continuously seek the same relief which was already denied.

27.    Respondent is collaterally estopped from bringing the present Order to Show Cause. An order entered on a motion is entitled to the same res judicata and collateral estoppel treatment that a judgment gets.  David D. Siegel, New York Practice, p. 590, §445.  The Civil Court has already denied Respondent's previous motion for the same relief as requested in the present motion based on the same facts.

28.    The only difference is some three weeks later Respondent is offering to pay less money than on March 20, 2007 when her Order to Show Cause was denied, and three weeks later she still does not have the necessary fund to pay her arrears, despite being given four months to pay her arrears in a September 18, 2006 stipulation by the Petitioner.  Seven (7) months later and nothing has changed.

29.    The instant application is a blatant attempt by Respondent and her attorneys to forum shop.  The instant Order to Show Cause should have been referred to Judge Hagler.

30.    It is respectfully submitted that the Court, in signing the latest Order to Show Cause, abused its discretion to the substantial prejudice of the Petitioner.  Moreover, Petitioner has withstood more than its share of Respondent's dilatory and obfuscatory conduct, which conduct should not be permitted any longer.

31.    That this Court has repeatedly held that a party should not be able to avoid the consequences of a final judgment by resorting to a litany of Orders to Show Cause predicated upon largely repetitious supporting papers.  (See, annexed Memorandum of Law.)

32.    That it is respectfully submitted that the only viable method available to the Petitioner to put an end to this protracted litany of meritless Orders to Show Cause is to move pursuant to Section 5704 of the CPLR and seek the relief it surely deserves from this Court.  The record clearly establishes that the Civil Court has repeatedly disregarded its very own orders, simply to satisfy the Respondent's desire to waste Petitioner's time and money.

33.     That for all of the above reasons, it is submitted that justice, reason and fair play demand that Respondent's third Order to Show Cause be denied in all respects and that Petitioner herein be permitted to execute the warrant forthwith, dispensing with the Marshal's notice, to eliminate the likely possibility that Respondent will attempt, for the fourth time, to continue her course of dilatory conduct.

**WHEREFORE,** it is respectfully requested that the instant CPLR 5704 (b) be in all respects granted and that the annexed Order, which denies Respondent's Order to Show Cause and permits the warrant of eviction to be executed, in all respects be granted, along with such other and further relief as this Court deems just and proper.

**Dated:     Yonkers, New York**
**April 16, 2007**


**MATTHEW L. GORDON**

COUNTY OF WESTCHESTER  )

MANUEL PAGAN, BEING DULY SWORN, DEPOSES AND SAYS: THAT DEPONENT IS
NOT A PARTY TO THIS PROCEEDING, IS A LICENSED PROCESS SERVER OVER 18
YEARS OF AGE AND RESIDES AT NEW YORK, NEW YORK.

DEPONENT WAS     UNABLE     TO     SERVE     NKEMJIKA     S.     OBIECHINA,
D.M.D.(SUBTENANT),   TENANT(S)/OCCUPANT(S) BY PERSONAL DELIVERY.

AT 257 CENTRAL PARK WEST A/K/A 2 WEST 86TH STREET A/K/A 255 CENTRAL
PARK WEST
    SUITE 255 (PERIODONTAL AND GENERAL DENTISTRY OFFICE)  NEW YORK, NY
    10024


ON  05/10/06  AT  12:07 PM   DEPONENT SERVED THE ATTACHED

                    NOTICE OF PETITION AND PETITION

BY GAINING ADMITTANCE TO SAID PROPERTY AND DELIVERING TO AND LEAVING
A COPY THEREOF FOR EACH TENANT(S)/OCCUPANT(S) PERSONALLY WITH JANE
DOE - GENERAL AGENT (REFUSED NAME),   A PERSON OF SUITABLE AGE AND
DISCRETION, WHO WAS WILLING TO RECEIVE SAME AND WHO RESIDED OR WAS
EMPLOYED AT SAID PROPERTY.

DEPONENT DESCRIBES THE INDIVIDUAL SERVED AS FOLLOWS:

SEX: FEMALE
SKIN COLOR: WHITE
HAIR COLOR: BLACK
AGE: 21-35
HEIGHT: 5'4"/5'8"
WEIGHT: 131-160 LBS
ADDITIONAL FEATURES:
NAME OF INDIVIDUAL SERVED: JANE DOE - GENERAL AGENT (REFUSED NAME)

AND ON  05/10/06  DEPONENT SERVED COPIES OF THE WITHIN
NOTICE OF PETITION AND PETITION   ON EACH TENANT/OCCUPANT SERVED AT
THE PROPERTY SOUGHT TO BE RECOVERED,   BY DEPOSITING A TRUE COPY FOR
EACH NAMED TENANT/OCCUPANT OF THE SAME ENCLOSED IN A POST PAID
WRAPPER, ADDRESSED TO EACH TENANT/OCCUPANT AT THE PROPERTY SOUGHT TO
BE RECOVERED, IN THE POST OFFICE BY CERTIFIED MAIL  AND BY REGULAR
FIRST CLASS MAIL WITHIN THE STATE OF NEW YORK.

AND ON 05/10/06 ADDITIONAL MAILING BY REGULAR AND CERTIFIED MAIL TO:
NKEMJIKA S. OBIECHINA, D.M.D., 44 CYPRESS STREET, JERSEY CITY, NEW
JERSEY

07035

SWORN TO BEFORE ME ON 05/10/06

                                              MANUEL PAGAN
                                              LIC.# 1073712

        ALAN ABODY
NOTARY PUBLIC, STATE OF NEW YORK
        NO. 5014371
  QUALIFIED IN WESTCHESTER COUNTY
  COMMISSION EXPIRES JULY 15, 2007

_____ IU TENANT - If you are dependent on a person in the military service of the United States or the State of New York, advise the clerk immediately in order to protect your rights.

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK
------------------------------------X
CENTRAL PARK WEST ASSOCIATES,

                    Petitioner,


        -against-

NKEMJIKA S. OBIECHINA, D.M.D. (SUBTENANT)
257 CENTRAL PARK WEST A/K/A 2 WEST 86TH STREET
A/K/A 255 CENTRAL PARK WEST - SUITE 255
NEW YORK, NEW YORK 10024,    (PERIODONTAL AND GENERAL DENTISTRY
                              OFFICE)

                                NOTICE OF PETITION
                                COMMERCIAL
                    Respondent.
------------------------------------X

    To the Respondent[s] above named and described, in possession of the premises hereinafter described or claiming possession thereof:

    PLEASE TAKE NOTICE, that the annexed Petition of CENTRAL PARK WEST ASSOCIATES, verified the 3RD of MAY 2006 prays for a final judgment of eviction, awarding to the Petitioner possession of premises described as follows:

257 CENTRAL PARK WEST A/K/A 2 WEST 86TH STREET
A/K/A 255 CENTRAL PARK WEST - SUITE 255
NEW YORK, NEW YORK 10024
(PERIODONTAL AND GENERAL DENTISTRY OFFICE)

as demanded in the Petition.

    TAKE NOTICE also that demand is made in the Petition herein for judgment against you, for the sum of $36,798.34 PLUS $750.00 in legal costs and disbursements of this proceeding.

    TAKE NOTICE also that WITHIN FIVE DAYS after service of this Notice of Petition upon you, you must answer, either orally before the Clerk of this Court at 111 Centre Street, County of New York, City and State of New York or in writing by serving a copy thereof

upon the undersigned attorney for the Petitioner, and by filing the original of such answer, with proof of service thereof, in the Office of the Clerk. Your answer may set forth any defense or counterclaim you may have against the Petitioner. On receipt of your answer, the Clerk will fix and give notice of the date for trial or hearing which will be held not less than 3 nor more than 8 days thereinafter, at which you must appear. If, after the trial or hearing, judgment is rendered against you, the issuance of a warrant dispossessing you may, in the discretion of the Court, be stayed for **FIVE** days from the date of such judgment.

**TAKE NOTICE** also that if you fail to interpose and establish any defense that you may have to the allegations of the Petitioner, you may be precluded from asserting such defense or the claim on which it is based in any other proceeding or action.

In the event you fail to answer and appear, final judgment by default will be entered against you but a warrant dispossessing you will not be issued until the tenth day following the date of the service of this Notice of Petition upon you.

**TAKE NOTICE** that under Section 745 of the Real Property Actions and Proceedings Law, you may be required by the court to make a rent deposit, or a rent payment to the petitioner, upon your second request for an adjournment or if the proceeding is not settled or a final determination has not been made by the Court within 30 days of the first court appearance. Failure to comply with an initial rent deposit or payment order may result in the entry of a final judgment against you without a trial. Failure to make subsequent required deposits or payments may result in an immediate trial on the issues raised in your answer.

Dated: May 3, 2006

JACK BAER
CHIEF CLERK OF THE CIVIL COURT OF
THE CITY OF NEW YORK

NOVICK, EDELSTEIN, LUBELL, REISMAN,
WASSERMAN & LEVENTHAL, P.C.
733 Yonkers Avenue
Yonkers, NY 10704
(914) 375-0100

Jack Baer
CHIEF CLERK
MAY – 8 2006
NEW YORK COUNTY
CIVIL COURT

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK
------------------------------------X
CENTRAL PARK WEST ASSOCIATES,

                         Petitioner,

              -against-

NKEMJIKA S. OBIECHINA, D.M.D. (SUBTENANT)
257 CENTRAL PARK WEST A/K/A 2 WEST 86TH STREET
A/K/A 255 CENTRAL PARK WEST - SUITE 255
NEW YORK, NEW YORK 10024,      (PERIODONTAL AND GENERAL DENTISTRY
                                OFFICE)

                                        PETITION
                                   NONPAYMENT COMMERCIAL

                         Respondent.
------------------------------------X
        The Petition of CENTRAL PARK WEST ASSOCIATES alleges upon
information and belief as follows:

        1.    Petitioner is the OWNER of the premises 257 CENTRAL PARK
WEST A/K/A 2 WEST 86TH STREET A/K/A 255 CENTRAL PARK WEST - SUITE
255, NEW YORK, NEW YORK 10024 (PERIODONTAL AND GENERAL DENTISTRY
OFFICE), and is authorized to maintain this proceeding.

        2.    Respondent(s)    NKEMJIKA S. OBIECHINA, D.M.D. is (are)
the subtenant(s) in possession of said premises pursuant to a
written sublease agreement dated February 12, 2003 for the term
April 1, 2003 through March 31, 2013.

        3.    Respondents are now in possession of said premises.
Said premises are not the residence of the tenant and undertenants
herein.

        4.    The premises 257 CENTRAL PARK WEST A/K/A 2 WEST 86TH
STREET A/K/A 255 CENTRAL PARK WEST - SUITE 255, NEW YORK, NEW YORK
10024 (PERIODONTAL AND GENERAL DENTISTRY OFFICE) were rented for
business purposes and pursuant to the preamble of the
aforementioned sublease were rented for use as a(n) periodontal and
general dentistry office. The demised premises is described as:

        257 CENTRAL PARK WEST A/K/A 2 WEST 86TH STREET
        A/K/A 255 CENTRAL PARK WEST - SUITE 255
        NEW YORK, NEW YORK 10024
        (PERIODONTAL AND GENERAL DENTISTRY OFFICE)
        (PSYCHOTHERAPY OFFICE)

5.    Said premises are situated within the territorial jurisdiction of the Civil Court of the City of New York, County of New York.

6.    Pursuant to the written lease as aforementioned, Respondent promised to pay to Landlord as rent **the sum of $4,767.49 each month** in advance on the first (1st) day of each month.

7.    Respondent currently owes base rent and additional rent in the amount of $37,548.34.  This amount is derived as follows:

| | |
|---|---:|
| May 2006 rent | $ 4,767.49 |
| April 2006 rent | 4,767.49 |
| March 2006 rent | 4,606.27 |
| February 2006 rent | 4,606.27 |
| January 2006 rent | 4,606.27 |
| December 2005 rent | 4,606.27 |
| November 2005 rent | 4,606.27 |
| October 2005 rent (bal.) | 404.86 |
| Electricity | 3,454.71 |
| N.G.C. | 50.00 |
| Security Deposit | 322.44 |
| Legal Fees | 750.00 |
| **Total** | **$37,548.34** |

8.    As a result of the foregoing, Respondent owes landlord/prime tenant the total amount of **$37,548.34** as rent and added rent.

9.    Said rent and added rent have been demanded from the subtenant, since same became due, by three (3) day notice in writing, a copy of which with proof of service is annexed hereto.

10.    Respondent(s)/Subtenant(s) have defaulted in the payments thereof and continue in possession of premises without permission after said default.

11.    The premises are not subject to rent control, rent stabilization or the Emergency Tenant Protection Act of 1974, because said premises are rented for business purposes.

12.    The premises are a multiple dwelling and pursuant to the Housing Maintenance Code Section 27-2097 there is a currently effective registration statement on file with the Office of Code Enforcement which designates the managing agent named below, a natural person over 21 years of age, to be in control of and responsible for the maintenance and operation of the dwelling:

Multiple Dwelling Registration:    #136687
Agent:    RICHARD MALPICA
         331 MADISON AVENUE
         NEW YORK, NEW YORK 10017

13.     Petitioner lacks written information or notice of any address where Respondent Subtenant-resides-is employed-has place of business-has principal office-place of business in New York State other than the property to be recovered, except:

NKEMJIKA S. OBIECHINA, D.M.D.
44 CYPRESS STREET
JERSEY CITY, NEW JERSEY 07035

**WHEREFORE**, Petitioner requests a final judgment against Respondent(s) for the rent demanded therein, awarding possession of the premises to Petitioner/Landlord/Prime Tenant, and directing the issuance of a warrant to remove Respondent(s) from possession of the premises, together with costs and disbursements of this proceeding.

Dated: May 3, 2006
        Yonkers, New York

                    CENTRAL PARK WEST ASSOCIATES
                    PETITIONER/LANDLORD/PRIME TENANT

## C O M M E R C I A L

NKEMJIKA S. OBIECHINA, D.M.D. (SUBTENANT)
257 CENTRAL PARK WEST A/K/A 2 WEST 86TH STREET
A/K/A 255 CENTRAL PARK WEST - SUITE 255
NEW YORK, NEW YORK 10024

PREMISES: 257 CENTRAL PARK WEST A/K/A 2 WEST 86TH STREET
A/K/A 255 CENTRAL PARK WEST - SUITE 255
NEW YORK, NEW YORK 10024
(PERIODONTAL AND GENERAL DENTISTRY OFFICE)

PLEASE TAKE NOTICE that you are hereby required to pay to **CENTRAL PARK WEST ASSOCIATES**, Landlord/Prime Tenant of the above described premises, the sum of **$38,414.07** for rent of the premises pursuant to your written sublease agreement dated February 12, 2003 as follows:

| | |
|---|---|
| April 2006 rent | $ 4,767.49 |
| March 2006 rent | 4,606.27 |
| February 2006 rent | 4,606.27 |
| January 2006 rent | 4,606.27 |
| December 2005 rent | 4,606.27 |
| November 2005 rent | 4,606.27 |
| October 2005 rent | 4,606.27 |
| September 2005 rent (bal.) | 1,798.59 |
| Electricity | 3,087.93 |
| N.G.C. | 50.00 |
| Security Deposit | 322.44 |
| Legal Fees | 750.00 |
| **Total** | **$38,414.07** |

You are required to pay within Three (3) days from the date of service of this notice, (in no event later than **April 25, 2006**) or to give up possession of the premises to the landlord/prime tenant. If you fail to pay or to give up the premises, the landlord/prime tenant will commence summary proceedings against you to recover possession of the premises.

Date:    April 12, 2006

CENTRAL PARK WEST ASSOCIATES

By: _____
Peter Lubell, Attorney
for Petitioner/Landlord/Prime Tenant
733 Yonkers Avenue
Yonkers, New York 10704
(914) 375-0100

SEE ATTACHED FOR ADDITIONAL MAILING:

NKEMJIKA S. OBIECHINA, D.M.D.
44 CYPRESS STREET
JERSEY CITY, NEW JERSEY 07035